Filed 6/2/16

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
)       S218861
      v. )
)     Ct.App. 4/1 D063394
EMMANUEL CASTILLOLOPEZ, )
)     San Diego County
      Defendant and Appellant. )   Super. Ct. No. SCD242311
_____ )

A police officer found a Swiss Army knife in a pocket of defendant Emmanuel Castillolopez's jacket. One of the blades was fully extended. Defendant was convicted of carrying a concealed dirk or dagger in violation of Penal Code section 21310. Penal Code section 16470 defines a " 'dirk' or 'dagger' " as "a knife . . . that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death." Under this definition, "a pocketknife is capable of ready use as a stabbing weapon . . . only if the blade of the knife is exposed and locked into position." (*Ibid.*)

The Court of Appeal reversed defendant's conviction, ruling that there was no substantial evidence that the open blade of the Swiss Army knife was "locked into position" within the meaning of Penal Code section 16470 because the knife could be closed simply by folding the blade back into the handle. We agree that defendant's conviction cannot stand and therefore affirm the judgment of the Court of Appeal.

# I.

At about 10 p.m. on July 29, 2012, San Diego Police Officer Bryce Charpentier stopped a car in which defendant Emmanuel Castillolopez was riding as a passenger. During a patdown search, the officer found a knife in the front pocket of defendant's jacket. Officer Charpentier testified that "it was a collapsible knife, and the blade was in a locked, open position." The knife was a Swiss Army knife with multiple blades; only the "large blade" was exposed.

Officer Charpentier demonstrated at trial how to return the blade to its closed position:

"[Defense Counsel] You took the body of the knife in your right hand; correct?

"[Officer Charpentier] Yes, sir.

"Q Put your left hand on the blade of the knife?

"A Correct, sir.

"Q Pushed the blade down into the body of the knife?

"A That is correct.

"Q Did you have to do anything to be able to perform that? Is there anything you have to push on the knife or anything like that to be able to do that?

"A I have to use force to close it."

Cameron Gary, a supervising investigator for the San Diego County District Attorney's Office, testified for the prosecution as a weapons expert. Gary testified that the blade of the knife was 2 to 3 inches long and had "a friction, slash, spring lock. There's many different terms for it. I don't remember the exact term for this particular type." He explained: "[Y]ou've got . . . a fingernail type of indentation on the side of the blade. So you can actually take your fingernail and pull out. And you're going to feel some friction and spring tension. The spring tension drops the spring mechanisms inside the knife that resists you from opening it. Once you get past a certain point, the resistance releases, and then it

2

locks into place. . . . [Y]ou have to overcome that spring tension and that friction in order to close it back up again. That's what holds it in place." Gary added that there was a "kind of a clicking sound" when the blade opened, which meant the blade was "locked" into position. In Gary's opinion, every folding knife is similarly capable of being "locked": "[T]here is no folding knife that doesn't lock some way because, otherwise, the blade wouldn't be able to stay in place if you're trying to impale something or to cut it."

Although Gary testified that, in his view, the blade was locked, he observed that he would "have a difficult time punching through this binder obviously with this — without it collapsing." When asked if he would describe a Swiss Army knife "as a defensive weapon," Gary answered, "I would actually describe it as more of a tool."

On cross-examination, Gary again closed the knife and agreed with defense counsel's description that "all you did was apply pressure to the blade and it closed." He also agreed "there are knives in existence where you have to manipulate the locking mechanism on the knife to be able to close the blade." Gary further agreed that the effectiveness of defendant's Swiss Army knife "as far as stabbing is limited because should it hit something hard like bone, there is a risk of it collapsing on the user." When asked whether he agreed that the knife was "primarily not a stabbing instrument," Gary again testified that he would "classify this as being more of a tool."

Defendant called as an expert witness Raymond Flores, who sells knives at a uniform store that caters to law enforcement and fire department personnel. He described a "locking blade knife" as follows:

"[Flores] It would be a knife that when it's expanded, it would lock into place, and you would have to press a release to collapse it, to make it fold again.

3

"[Defense counsel]  You would agree then, wouldn't you, that in order to close a locking blade knife, you would have to do something to unlock the blade?

"A  That is correct.

"Q  You can't just, by putting pressure on the blade, close a locking blade knife; correct?

"A  No, sir."

Flores testified that defendant's Swiss Army knife was not a locking blade knife, because "[t]here's no device that — once a blade is open, that you have to depress to collapse the knife."  Flores agreed that he would consider a Swiss Army knife to be "a multi-tool or survival tool."

Defendant was convicted of a felony violation of carrying upon his person a concealed dirk or dagger and admitted that he had served a prior prison term and had suffered a "strike" prior conviction for a serious or violent felony.  (Pen. Code, §§ 21310, 667.5, subd. (b), 667, subds. (b)–(i), 1170.12.)  He was sentenced to the lower term of 16 months in prison, doubled under the Three Strikes law based on his prior conviction, plus a one-year enhancement for the prior prison term, for a total of three years and eight months in prison.  (*Ibid*.)

The Court of Appeal reversed defendant's conviction, holding that "the phrase 'locked into position' in section 16470 plainly means 'firmly fixed in place or securely attached so as to be immovable,' " and finding insufficient evidence that the exposed blade of defendant's Swiss Army knife satisfied that definition.

## II.

### A.

Penal Code section 21310 makes it a criminal offense to carry "concealed upon the person any dirk or dagger."  The origins of the statute can be traced to 1917, when the Legislature enacted a statute that prohibited possessing several types of dangerous weapons " 'commonly associated with criminal activity' "

4

(*People v. Bell* (1989) 49 Cal.3d 502, 544), including "a blackjack, slungshot, billy, . . . metal knuckles, [or] bomb," and carrying "a dirk or a dagger." (Stats. 1917, ch. 145, § 2, p. 221; see *People v. Rubalcava* (2000) 23 Cal.4th 322, 328–329 (*Rubalcava*).) In 1923, the law was changed to prohibit carrying a dirk or dagger only if it was "concealed upon his person." (Stats. 1923, ch. 339, §§ 1, 17, pp. 696, 702.)[1]

Neither of these statutes defined the terms "dirk" or "dagger." Courts accordingly construed these terms in accordance with their dictionary definitions: "Dirk and dagger are used synonymously and consist of any straight stabbing weapon, as a dirk, stiletto, etc. (Century Dict.) They may consist of any weapon fitted primarily for stabbing. The word dagger is a generic term covering the dirk, stiletto, poniard, etc. (Standard Dict.)" (*People v. Ruiz* (1928) 88 Cal.App. 502, 504; see also *Rubalcava*, *supra*, 23 Cal.4th at p. 329.) The Legislature later codified the prohibition against carrying a concealed dirk or dagger in Penal Code former section 12020 (former section 12020), as part of The Dangerous Weapons' Control Law. (Stats. 1953, ch. 36, § 1, p. 653.) The terms "dirk" and "dagger," however, remained undefined. (*Rubalcava*, *supra*, 23 Cal.4th at pp. 328–329; *People v. Bain* (1971) 5 Cal.3d 839, 850.)

Whether a folding knife or pocketknife qualified as a dirk or dagger under the statute, as the courts understood it, depended on whether the blade "locked" into place. (See *People v. Forrest* (1967) 67 Cal.2d 478, 479 (*Forrest*) [an "oversized pocketknife" with blades that "do not lock into place" was not a dirk or dagger]; *People v. Bain*, *supra*, 5 Cal.3d at p. 852 [a pocketknife with the blade

---

[1] This provision was later amended in 1925 (Stats. 1925, ch. 323, § 1, p. 542) and again 1935 (Stats. 1935, ch. 753, § 1, p. 2120). Neither amendment is relevant here.

5

open could be a dirk or dagger because the blade "locks in place"]; *People v. Shah* (1949) 91 Cal.App.2d 716, 718 [a "long pocket knife" was a dirk or dagger because it had a " 'fixed blade' " that could not be closed until the lock was "released"].)

In 1993, the Legislature undertook the first of several efforts to supply a definition of "dirk or dagger."  In its initial effort, the Legislature defined " 'dirk' or 'dagger' " to mean "a knife or other instrument with or without a handguard that is primarily designed, constructed, or altered to be a stabbing instrument designed to inflict great bodily injury or death."  (Pen. Code, § 12020, subd. (c)(24), as added by Stats. 1993, ch. 357, § 1, p. 2155.)  But this definition "ultimately proved too narrow and too difficult of proof.  Prosecutors complained that 'since we can never show that the primary purpose of a butcher knife, hunting knife, survival knife, ice pick, etc., is to cause death or great bodily injury by stabbing, we cannot obtain convictions under the statute,' even when the person was carrying the concealed instrument for potential use as a weapon."  (*Rubalcava*, *supra*, 23 Cal.4th at p. 337 (conc. opn. of Werdegar, J.).)

In 1995, the Legislature amended the reference to a knife or other instrument that is "primarily designed, constructed, or altered to be a stabbing instrument" with a broader reference to a knife or other instrument that is "capable of ready use as a stabbing weapon."  (Pen. Code, § 12020, subd. (c)(24) as amended by Stats. 1995, ch. 128, § 2, p. 504.)  The Legislative Counsel recognized that this change "would expand the scope of existing crimes."  (Legis. Counsel's Dig., Assem. Bill No. 1222 (1995-1996 Reg. Sess.) 5 Stats. 1995, Summary Dig., p. 35.)  But this change, too, raised concerns — this time that the definition was too broad, rather than too narrow, particularly as applied to folding knives and pocketknives.  In response to those concerns, the Legislature amended the statute in 1997 to provide that a folding knife or pocketknife would qualify as

6

a dirk or dagger "capable of ready use as a stabbing weapon" only if the blade of the knife was "exposed and locked into position." (Pen. Code, § 12020, subd. (c)(24) as amended by Stats. 1997, ch. 158, § 1, p. 778; *In re George W.* (1998) 68 Cal.App.4th 1208, 1214 [quoting statute].) The statute was later repealed and reenacted without substantive change as Penal Code section 16470 (section 16470), as part of the Deadly Weapons Recodification Act of 2010. (Stats. 2010, ch. 711, § 6, pp. 4146, 4150.)

**B.**

The version of the statute currently in force provides in full: "As used in this part, 'dirk' or 'dagger' means a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death. A nonlocking folding knife, a folding knife that is not prohibited by Section 21510,[2] or a pocketknife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position." (§ 16470.) The evidence at trial showed that defendant was carrying concealed on his person a pocketknife with

_____

**2** Penal Code section 21510 prohibits the possession, carrying, sale, loan, or transfer of switchblade knives with blades of two or more inches in length. The term "switchblade knife" is defined as "a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a . . . flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever. 'Switchblade knife' does not include a knife that opens with one hand utilizing thumb pressure applied solely to the blade of the knife or a thumb stud attached to the blade, provided that the knife has a detent or other mechanism that provides resistance that must be overcome in opening the blade, or that biases the blade back toward its closed position." (Pen. Code, § 17235.)

one of the cutting blades exposed.  The question is whether that blade was also "locked into position" within the meaning of section 16470.

This court's approach to questions of statutory interpretation is well-established.  "Our role in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law.  [Citation.]  Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning.  [Citation.]  We do not, however, consider the statutory language in isolation, but rather examine the entire substance of the statute in order to determine the scope and purpose of the provision, construing its words in context and harmonizing its various parts.  [Citation.]"  (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1040.)

The ordinary meaning of the word "lock" includes to "make fast" and, as applied in particular to mechanical devices, "to make fast by or as if by the interlacing or interlocking of parts" — such as "by the engaging of parts or the action of a restraint esp. friction," as one might "lock" the "wheels of a carriage." (Webster's 3d New Internat. Dict. (1993) p. 1328.)  The definition of "fast" includes "firmly fixed:  immovable or moved only with the greatest difficulty." (*Id*. at p. 826.)  On this understanding, a pocketknife blade is "locked into position" if it is "firmly fixed" in position by means of or as if by the interlacing or interlocking of parts.  While friction can be used in some circumstances to lock a device in position, the critical question is whether it has made the device "fast" — that is, "immovable or moved only with the greatest difficulty."  (*Ibid*.)  Although a blade might be held open in a particular position by means of friction, a blade that can be closed simply by applying pressure to the back of the blade has not been "made fast," and therefore is not "locked into position" as the term is ordinarily understood.

This understanding is consistent with the more technical usage of the term "locked" in the context of knifemaking generally, and in construction of the dirk or dagger statute in particular. As section 16470 indicates, folding knives come in locking and nonlocking varieties. We explored the distinction between locking and nonlocking folding knives in our decision in *Forrest*, *supra*, 67 Cal.2d 478, which concerned whether an oversized pocketknife qualified as a dirk or dagger under the statute then in effect, which did not define those terms. In concluding that the knife at issue was not a dirk or dagger, we noted that "[t]he courts have only applied the section to instruments where the blades and handle are solid, or where the blade *locks* into place." (*Id.* at p. 480, italics added.) As an example, we cited *People v. Shah*, *supra*, 91 Cal.App.2d 716, which upheld the defendant's conviction for carrying a spring-blade knife with a " 'set lock' " that "opens by pressing a button" and could not be closed until the lock was "released." (*Id*. at p. 718; *Forrest*, 67 Cal.2d at p. 480 [describing the knife at issue in *Shah* as "a dagger because the blade locked into place"].) By contrast, we held that the oversized pocketknife in question in *Forrest* was not a dirk or dagger because "the knife folds like a pocketknife, and the blade of the knife when opened does not lock into place." (*Id.* at p. 481.) "This," we explained, "severely limits its effectiveness as a stabbing weapon, because if the blade should hit a hard substance such as a bone, there is a grave danger that the blade would close upon the hand of the wielder." (*Ibid.*)

Other cases, decided both before and after the enactment of the present version of section 16470, have used the term "locked" or "locking" in the same manner. (See *People v. Bain*, *supra*, 5 Cal.3d at p. 852 [jury could find the defendant guilty of violating the dirk or dagger statute where, unlike the knife at issue in *Forrest*, the blade of the folding knife "locks in place"]; *In re George W.*, *supra*, 68 Cal.App.4th at p. 1211 [folding knife had a blade that "locked into place

when opened," where, "[t]o fold the knife closed one had to push a release lever to permit the blade to retract into the handle"]; cf. *Rubalcava*, *supra*, 23 Cal.4th at p. 332, fn. 6 [a defendant would not be guilty of knowingly and intentionally carrying a concealed dirk or dagger if a person gave the defendant "a fixed-blade knife wrapped in a paper towel," but told the defendant "the knife has a folding blade that cannot lock"]; *In re T.B.* (2009) 172 Cal.App.4th 125, 128-129 [multi-tool found in student's possession on school grounds qualified as a " 'folding knife with a blade that locks into place' " for purposes of Pen. Code, § 626.10, subd. (a), where, " 'when the blade is open, certainly it is in a locked position, and one cannot move the blade' "].)

As these decisions indicate, the essential difference between a nonlocking folding knife and a locking folding knife has been understood to be whether the exposed knife blade, is immobile, thereby preventing accidental collapse while the knife is in use.  (See *Forrest*, *supra*, 67 Cal.2d at p. 480.)  We presume the Legislature was aware of this usage when it enacted the present version of section 16470 in 1997.  (See *Viking Pools, Inc. v. Maloney* (1989) 48 Cal.3d 602, 609 ["The Legislature is deemed to be aware of existing laws and judicial decisions construing the same statute in effect at the time legislation is enacted, and to have enacted and amended statutes ' " 'in the light of such decisions as have a direct bearing upon them.' " ' "].)  It follows that when the Legislature referred to blades "locked into position," it intended to refer to knives with blades rendered immobile, as by operation of a locking mechanism, rather than knives with blades that could be collapsed simply by folding the blade back into the handle.

The Attorney General notes that, depending on the context, the phrase "locked in position" can also refer, less technically, to items that are "secured in a rigid or fastened location," but not rendered immobile.  For example, she observes, it is commonplace to refer to "locking" one's knees, or "[striking] a blow with a

10

[locked] wrist." (Quoting Webster's 3d New Internat. Dict., *supra*, at p. 1328.) She contends that the reference to "locked in position" in section 16470 should be read in a similarly flexible fashion in order to effectuate the statute's apparent purpose of "criminaliz[ing] the carrying of such knives because — in the open position — pocketknives become readily capable of being used as a stabbing weapon." She thus contends that the blade of a folding knife or pocketknife is "exposed and locked into position" within the meaning of the statute if the blade is "secured in the open position," as by spring tension or friction, even if the blade can be folded back into the handle simply by applying pressure to the back of the blade.

We can readily agree that the precise meaning of the term "locked into position," and the degree of rigidity involved, may vary by context; a locked knee is not rendered immobile in the same way as a locked door. But as the Legislature was aware, while knees generally do not come in locking and nonlocking varieties, folding knives do. Consideration of context suggests that by using the term "locked into position" in section 16470, the Legislature did not mean locked in the manner that a knee might be locked, but locked in the manner that a folding knife is locked — that is, locked so that the blade is fixed or immobile.

The Attorney General's contrary submission would in effect make nearly every folding knife a locking knife, thereby rendering the category of nonlocking folding knives essentially a null set. The testimony of the prosecution's own knife expert underscores the point. In taking the view that the exposed blade of defendant's Swiss Army knife was "locked into position," he also testified that "there is no folding knife that doesn't lock some way because, otherwise, the blade wouldn't be able to stay in place if you're trying to impale something or to cut it." We are reluctant to adopt an interpretation of section 16470 that would drain the

11

statutory distinction between nonlocking and locking folding knives of any practical significance.

Of course, as the Attorney General points out, the Legislature did not categorically exempt all nonlocking folding knives from the reach of section 16470, instead providing that such knives qualify as covered dirks or daggers if the blades are "exposed and in the locked position." This could conceivably be read to suggest, as the Attorney General argues, that even the blade of a nonlocking folding knife — i.e., one lacking a means of rendering the blade immobile — can nevertheless be "locked into position" when held in place by means of tension or friction, even though the application of ordinary pressure would suffice to collapse the blade. Rejecting this argument, the Court of Appeal believed the more likely conclusion is that, by including an express reference to "nonlocking folding" knives, the Legislature intended to cover knives that, though designed without a locking mechanism, are "altered in some manner to firmly fix or fasten the blade in an open position and thereby render the blade immovable." We need not here decide whether the Court of Appeal was correct or whether the language is better understood simply as the product of a drafting error.[3] It suffices

---

[3]     As introduced, the bill that amended former section 12020 in 1997 did not mention nonlocking folding knives or pocketknives. It would have amended former section 12020, subdivision (c)(24), to state: "A folding knife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position." (Assem. Bill No. 78 (1997-1998 Reg. Sess.) § 1, as introduced Dec. 18, 1976.) Knife manufacturer Buck Knives suggested amending the bill to read: "A non-locking folding knife or a pocket knife is not 'capable of ready use' within the meaning of this section. A folding knife with a locking blade is not 'capable of ready use' within the meaning of this section unless it is carried in an open and locked position." (Chris Micheli, on behalf of Buck Knives et al., memo to Assem. Pub. Safety Com. et al., re: Assem. Bill No. 78 (1997-1998) Mar. 17, 1997, p. 5, italics omitted.) The bill was thereafter amended to add the current language: "A nonlocking folding knife, a

*(Footnote continued on next page.)*

to note that either explanation is more plausible than the Attorney General's submission, which would require us to draw the unlikely conclusion that the Legislature used the term "lock" to mean two different things in the very same sentence.  (Cf. *People v. Blackburn* (2015) 61 Cal.4th 1113, 1125 [" '[I]t is generally presumed that when a word is used in a particular sense in one part of a statute, it is intended to have the same meaning if it appears in another part of the same statute.' "].)

Consideration of statutory purpose does not persuade us that, as the Attorney General contends, the reference to "locked into position" must be read in a less " 'literal' " manner.  As the Attorney General says, the 1995 amendment to the "dirk or dagger" definition was designed to broaden the reach of the statute by covering knives or other instruments that are "capable of ready use as . . . stabbing weapon[s]," and not only knives or other instruments specifically designed for that purpose.  (Stats. 1995, ch. 128, § 2, p. 504.)  But the purpose of the 1997 amendment, which added the language at issue here, was to narrow the reach of the 1995 amendment with respect to nonlocking folding knives and pocketknives.  The 1997 amendment thus expressly provides that a nonlocking folding knife or pocketknife is not "capable of ready use as a stabbing weapon" unless the blade of the knife is both "exposed" and "locked into position."  (§ 16470.)  Had the

---

*(Footnote continued from previous page.)*

folding knife that is not prohibited [as a switchblade knife], or a pocketknife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position."  (Assem. Bill No. 78 (1997-1998 Reg. Sess.) as amended Mar. 17, 1997.)

Legislature intended to cover all folding knives and pocketknives that are carried in a way that makes it possible for the user to harm another, the Legislature could have required simply that the blade be "exposed."  It instead required that the blade be both "exposed" and "locked into position."  (*Ibid*.)  The latter requirement is consistent with the understanding, expressed decades ago in *Forrest*, that if the blade of a folding knife is not "lock[ed] into place" by means that render the blade fixed or immobile, the risk of accidental collapse "severely limits its effectiveness as a stabbing weapon."  (*Forrest*, *supra*, 67 Cal.2d at p. 481.)

## C.

In the present case, the prosecution's expert demonstrated that the exposed blade of defendant's Swiss Army knife was not fixed or immobile and could be closed simply by applying pressure to the back of the blade.  The blade therefore was not "locked into position" within the meaning of section 16470, and the knife therefore was not a prohibited " 'dirk' or 'dagger.' "  Defendant's conviction must therefore be reversed.

### DISPOSITION

The judgment of the Court of Appeal is affirmed.


**KRUGER, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**

14

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Castillolopez

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 225 Cal.App.4th 638
**Rehearing Granted**

_____

**Opinion No.** S218861
**Date Filed:** June 2, 2016

_____

**Court:** Superior
**County:** San Diego
**Judge:** Albert T. Harutunian III

_____

**Counsel:**

Raymond Mark DiGuiseppe, under appointment by the Supreme Court, and Maureen M. Bodo, under appointment by the Court of Appeal, for Defendant and Appellant.

Meyer, Darragh, Buckler, Bebenek & Eck and Daniel C. Lawson for American Knife & Tool Institute as Amicus Curiae on behalf of Defendant and Appellant.

Seiler Epstein Ziegler & Applegate and George M. Lee for Knife Rights Foundation, Inc., and Second Amendment Foundation, Inc., as Amici Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Steven T. Oetting, Deputy State Solicitor General, Julie L. Garland, Assistant Attorney General, William M. Wood, Meagan J. Beale and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Raymond Mark DiGuiseppe
Post Office Box 10790
Southport, NC  28461
(910) 713-8804

George M. Lee
Seiler Epstein Ziegler & Applegate
601 Montgomery Street, Suite 2000
San Francisco, CA  94111
(415) 979-0500

Jennifer B. Truong
Deputy Attorney General
600 W. Broadway, Suite 1800
San Diego, CA  92101
(619) 645-2224