FRANSON, Acting P.J.
*419 Plaintiff Pacific Gas and Electric Company (PG&E) sued defendant HART High-Voltage Apparatus Repair and Testing Co., Inc. (HART) for negligently servicing a large transformer at a hydroelectric power plant and for damages under Public Utilities Code [1] section 7952. PG&E alleged it incurred direct and indirect costs of approximately $8.1 million.
HART filed a motion for summary adjudication that challenged all of PG&E's causes of action.[2] The trial court determined the evidence showed MID owned the power plant and the transformer allegedly damaged by *420 HART. The court concluded that because PG&E did not own the transformer, PG&E could not prove essential elements of its causes of action for negligence and damages under section 7952.
In the unpublished parts of this opinion addressing PG&E's negligence cause of action, we conclude (1) PG&E has standing to sue if it is a "real party in interest" pursuant to Code of Civil Procedure section 367 and (2) the evidence presented shows PG&E held sufficient interests in the transformer and the electricity it delivered to qualify as a real party in interest. Using the "bundle of sticks" metaphor in which each stick represents a legally recognized property interest, we conclude PG&E held sufficient sticks to qualify as a real party in interest. Therefore, PG&E may pursue its negligence cause of action against HART.
In the published parts of this opinion addressing PG&E's claim for damages under section 7952,[3] we reach the following conclusions. First, the transformer was "necessary or useful ... equipment" as that phrase is used in section 7952. Second, PG&E is an "electrical corporation" for purposes of section 7952. Third, the preposition "of" in the phrase "equipment of any ... electrical ... corporation" is used in the proprietary sense-that is, it refers to the corporation's ownership of property interests in the equipment. Fourth, the ownership of property interests in the equipment need not be complete ownership because the phrase "equipment of any ... electrical ... corporation" also encompasses equipment in which the corporation is a partial owner-that is, holds some of the *635 sticks in the bundle that represent the property interests in the equipment. Fifth, the evidence presented shows PG&E holds multiple property interests in the transformer and, thus, PG&E might be regarded as a partial owner of the transformer entitled to recover the measure of damages set forth in section 7952. Therefore, HART has not carried its burden of demonstrating PG&E's cause of action for damages under section 7952 lacks merit.
We therefore reverse the judgment and remand for further proceedings.
FACTS
PG&E, a California corporation, is a public utility regulated by the California Public Utilities Commission, and its stock is publicly traded under the symbol *421 "PCG." PG&E provides gas and electrical service to about 15 million end users in northern and central California.[4] The other plaintiff in this lawsuit, MID, is an irrigation district organized under the laws of the State of California with its principal place of business in Merced County.
PG&E and MID alleged they were "the owners and operators of a transformer located at the Exchequer Dam on the Merced River" in Merced County. The transformer was an Allis-Chalmers 100 MVA Auto Transformer and was part of the power plant at the Exchequer reservoir. The transformer was large, measuring almost nine feet wide, 23 feet long, and 12 feet high. When operational, the transformer contained approximately 6,800 gallons of oil and weighed 243,000 pounds. The transformer had been custom built to take the 13.8 kilovolt electricity generated at the Exchequer dam and transform it into voltages (i.e., 70 kilovolt and 115 kilovolt) that were fed into two separate transmission systems owned by PG&E.
The relationship between PG&E and MID as it pertains to the power plant and equipment located at the Exchequer reservoir is defined by their June 25, 1964, power purchase contract. The power purchase contract stated MID "shall construct at its own risk and expense, and shall be the sole owner (under Federal Power Commission License) of, the project " and set forth the requirements and specifications for its design and construction.[5] The specifications addressed the project's turbines, generators, and the transformer that is the subject of this litigation.
PG&E contends the power purchase contract (1) entitled it to all electricity generated by the project; (2) made it responsible for all costs associated with maintaining and operating the Exchequer power plant; and (3) granted it the right to enter upon, operate and maintain any part of the power plant in the event that MID failed to operate and maintain the project in accordance with the power purchase contract.
In July 2009, HART submitted a quote to MID for servicing the transformer. The work involved draining the transformer of insulating fluid, *422 performing an internal inspection, *636 removing and replacing five electro coolers, replacing a variety of gaskets, replacing other parts, refilling the transformer and performing tests. HART estimated the total price for this work at $122,415.
In September 2009, MID and HART signed Exchequer Contract 2009-08 pursuant to which MID agreed to the payment terms in the quote HART submitted and HART agreed to "perform all services as outlined in 'Quotation # 090825' dated Sept. 19, 2008, to PG&E's 'Construction Service Specification No. 4720 Rev. 2'."[6] The procedures HART agreed to perform stated HART would "[v]erify all tools and materials have been removed from the transformer after internal inspection and repairs have been performed."
HART also agreed to maintain insurance coverage in accordance with MID's written requirements. HART obtained $1 million in commercial general liability insurance and $5 million in excess/umbrella liability insurance. MID, but not PG&E, was named as an additional insured in the certificate of liability insurance.
On November 1, 2009, HART started performing the servicing work on the transformer. On November 5, 2009, a HART employee was reconnecting low-voltage leads inside the transformer. Another HART employee who was outside the transformer handed him a flat washer, a lock washer and a bolt. When the first employee brought the washers and bolt inside the transformer, his hand struck a support beam, which caused him to drop the washers and bolt into the transformer's windings. The bolt and lock washer were retrieved with a magnet, but attempts to retrieve the flat washer resulted in the washer falling further inside the windings. Additional attempts to retrieve the washer were unsuccessful.
HART asserted (1) the transformer was not physically damaged as a result of having the washer was dropped into it and (2) MID chose not to reenergize the transformer, allegedly out of concern that the transformer could be damaged if it was restarted with a loose washer inside it. PG&E disputed this assertion, stating the transformer was damaged. PG&E contended all parties agreed the transformer could not be reenergized with a loose metallic washer inside and, consequently, the transformer was rendered unsuited for its intended purpose and had to be replaced. PG&E and MID believed that energizing the transformer with the metallic washer inside would likely lead to a fire that would destroy the transformer and might cause an oil spill that would contaminate the Merced River.
*423 PROCEEDINGS
In November 2012, the first lawsuit arising out of the washer incident was filed against HART. Federal Insurance Company, as the subrogee of the ACWA Joint Powers Insurance Authority, sought to recover funds paid to MID under an insurance policy that covered the transformer. The subrogation action was filed in Merced County Superior Court and assigned case No. CV003013.
In December 2012, PG&E and MID, as coplaintiffs, filed a lawsuit against HART in Merced County Superior Court for damages arising out of the washer incident. In February 2013, based on a stipulation of the parties, the trial court consolidated the two lawsuits against HART.
In August 2013, MID assigned all rights to its causes of action arising from the *637 washer incident to PG&E, including the cause of action for breach of contract. In the assignment agreement, MID represented that it had received $1,032,000 pursuant to its insurance contract with the Joint Powers Insurance Authority to partially compensate it for damages or losses arising from the incident, which funds it agreed to forward to PG&E. MID also represented: "It has been fully compensated by PG&E for any costs and/or expenses M[ID] has incurred arising from or related to the Incident." MID and PG&E also agreed they would be represented by the same law firm in the lawsuit against HART, with PG&E being solely responsible for the attorney fees and costs of that representation.
In August 2014, PG&E and MID filed a first amended complaint, which is the operative pleading in this matter. The first amended complaint alleged four causes of action against HART: (1) negligence, (2) breach of contract, (3) violation of section 7952, and (4) violation of section 10251. The first amended complaint used the plural "plaintiffs" in each cause of action and, as a result, it appeared that PG&E was asserting claims under four legal theories. Subsequently, PG&E clarified that it was not claiming recourse to section 10251 and, on appeal, PG&E expressly abandoned the breach of contract cause of action. Accordingly, the causes of action for breach of contract and for violation of section 10251 are not analyzed in this opinion.
Motion for Summary Adjudication
In June 2015, HART filed a motion for summary adjudication as to all of PG&E's causes of action and as to MID's causes of action for violations of sections 7952 and 10251. The motion did not challenge MID's causes of action for negligence and breach of contract.
HART's separate statement of undisputed material facts asserted HART and MID were the only parties to the written contract for performing work on *424 the transformer and, therefore PG&E was not a party to the contract. Based on these factual assertions, HART argued any duty of care (an essential element of a negligence claim) that might have been created by the maintenance contract did not extend to PG&E.
HART's separate statement also asserted other facts were material and undisputed. The paragraphs most important to this appeal stated:
"6. At the time of the incident alleged in plaintiffs' complaint, [MID] was the sole owner of the Exchequer Transformer. [¶] ... [¶]
"7. PG&E did not own the transformer at the time of the incident."
The evidentiary support for these assertions as to the ownership of the transformer included various discovery responses and the June 25, 1964, power purchase contract between MID and PG&E, which stated MID "shall construct at its own risk and expense, and shall be the sole owner (under Federal Power Commission License) of, the project ." HART emphasized the contract's reference to MID as "the sole owner" and did not discuss the effect of the parenthetical immediately following that phrase.
PG&E's opposition papers addressed the question of ownership by (1) disputing paragraphs 6 and 7 of HART's separate statement and (2) asserting PG&E "did have ownership rights in the Exchequer Transformer at the time of the incident pursuant to the Power Purchase Agreement and under California statute." PG&E argued its ownership rights (1) entitled it to all electricity generated by the project; (2) made it responsible for all costs associated with maintaining and operating the *638 Exchequer power plant; and (3) granted it the right to enter upon, operate and maintain any part of the power plant in the event that MID failed to operate and maintain the project in accordance with the 1964 power purchase contract. PG&E stated its rights were protected by paragraph 12 of the 1964 power purchase contract, which stated in full:
"[MID] shall maintain and defend its land, easements, flowage rights, water rights, Federal and State licenses and permits, and all other rights and privileges necessary or useful to the operation of the project and shall not voluntarily convey, transfer or in any manner encumber any of such rights without the written consent of [PG&E]."
Similarly, paragraph 18 of the 1964 power purchase contract states no voluntary assignment of the contract shall be effective without the written consent of PG&E. This prohibition contains an exception that authorizes an assignment as security for MID's financing of the project.
*425 Order Granting Summary Adjudication
In September 2015, the trial court held a hearing on HART's motion for summary adjudication. In October 2015, the trial court filed a written order granting summary adjudication in favor of HART and against PG&E on all the causes of action stated in the operative complaint.
As to PG&E's negligence cause of action, the trial court's order stated HART was "entitled to judgment as a matter of law on the grounds that [HART's] Undisputed Material Facts Nos. 6 and 7 establish [PG&E] cannot prove an essential element of the claim for negligence, that is that [PG&E] was an owner of the property allegedly damaged by [HART]." The order also stated PG&E did not present admissible evidence supporting an inference that it possessed an ownership interest in the transformer. As to MID's assignment to PG&E of its claims and causes of action against HART, the court concluded the assignment was irrelevant because the operative pleading did not allege (1) PG&E was an assignee or (2) PG&E's cause of action for negligence was based on an assignment of rights from MID.
As to PG&E's cause of action under section 7952, the order stated HART was "entitled to judgment as a matter of law on the grounds that [HART's] Undisputed Material Facts Nos. 6 and 7 establish [PG&E] cannot prove an essential element of the claim for violation of Section 7952, that is that [PG&E] was the owner of the 'necessary and useful equipment' allegedly damaged by [HART]."
The order granting summary adjudication disposed of all of PG&E's causes of action against HART. Accordingly, in November 2015, the trial court entered a judgment stating (1) PG&E would recover nothing from HART on its complaint and (2) PG&E was liable for HART's costs. In December 2015, PG&E filed a notice of appeal from the judgment.
Judicial Notice of Legislative History
In June 2016, PG&E requested this court take judicial notice of documents compiled by LRI History LLC[7] relating to Statutes 1969, chapter 709 (Sen. Bill No. 939) and Statutes 1976, chapter 617 (Assem. Bill No. 3398). These statutes amended section 7952 and enacted *426 section 10251, respectively. In July 2016, this court *639 granted the request for judicial notice, which was unopposed.[8]
DISCUSSION
I. OVERVIEW OF BASIC CONCEPTS
An analysis of the parties' contentions relating to PG&E's standing to sue for negligence requires an understanding of the basic legal concepts of property, ownership and standing to sue. The concepts of property and ownership also are relevant to the analysis of PG&E's claim under section 7952.
A. Property v. Property Interest
The word "property" has multiple meanings.[9] ( Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc. (2014) 231 Cal.App.4th 134, 157, 180 Cal.Rptr.3d 173 ( Union Pacific ).) Sometimes "property" is used simply to refer to the physical object in question-that is, the thing itself. ( Ibid . ) Other times, the word "property" is used with greater accuracy to " 'to denote the legal interest (or aggregate of legal relations) appertaining to such physical object.' " ( Ibid . ) When used in the latter sense, "property" is composed of a " 'complex aggregate of rights (or claims), privileges, powers, and immunities.' " (Hohfeld, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning (1917) 26 Yale L.J. 710, 746 (Hohfeld ).)
Therefore, in a strict legal sense, a physical object such as the transformer is not itself "property," but the subject of property. ( Union Pacific , supra , 231 Cal.App.4th at p. 157, 180 Cal.Rptr.3d 173.) When used in this strict legal sense, the term "property" means only the rights, privileges, powers and immunities of the owner in relation to the thing, despite the use of the term to designate the thing (such as land or a chattel) itself. ( Ibid . ) These rights, privileges, powers and immunities include the possession, use, enjoyment and disposition of the thing. ( Ibid . )
Stated another way, "property" is the sum of all the legally recognized rights, privileges, powers and immunities incident to ownership of the thing.
*427 See Dickman v. Commissioner (1984) 465 U.S. 330, 336, 104 S.Ct. 1086, 79 L.Ed.2d 343 ; Hohfeld , supra , 26 Yale L.J. at p. 746.) The "bundle of sticks" metaphor[10] often is used to describe property, with each stick representing a right, privilege, power or immunity. (E.g., Union Pacific , supra , 231 Cal.App.4th at p. 157, 180 Cal.Rptr.3d 173 ; see Sterling Builders, Inc. v. United Nat. Ins. Co. (2000) 79 Cal.App.4th 105, 109, 93 Cal.Rptr.2d 697.)
*640 B. Ownership of Property
The definition of "owner" set forth in Black's Law Dictionary states: "One who has the right to possess, use and convey something; a person in whom one or more interests are vested . An owner may have complete property in the thing or may have parted with some interests in it (as granting an easement or making a lease)." (Black's Law Dict. (8th ed. 2004) 1137, italics added.) The use of the word "interests" in this definition of "owner" establishes a connection to the definition of "property" discussed earlier. Specifically, "interest" is defined as follows: "Collectively, the word includes any aggregation of rights, privileges, powers, and immunities; distributively, it refers to any one right, privilege, power, or immunity." (Black's Law Dict., supra , at p. 828; see Union Pacific , supra , 231 Cal.App.4th at p. 157, 180 Cal.Rptr.3d 173.) Thus, the word "interests" is an overarching label for the rights, privileges, powers and immunities that aggregate to constitute "property."
The term "owner" is applied to a variety of situations, as is demonstrated by the types of owners listed in Black's Law Dictionary. The list includes "beneficial owner," "legal owner," "general owner," "special owner" and "limited owner." (Black's Law Dict., supra , at pp. 1137-1138.) A "beneficial" or "equitable owner" is defined as "[o]ne recognized in equity as the owner of something because use and title belong to that person, even though legal title may belong to someone else; esp., one for whom property is held in trust." (Id . at p. 1137, italics added; see Miller v. Dyer (1942) 20 Cal.2d 526, 529, 127 P.2d 901 [equitable owner].) In contrast, the "legal owner" is "[o]ne recognized by law as the owner of something; esp. one who holds legal title to property for the benefit of another." (Id . at p. 1138, italics added; see Parkmerced Co. v. City and County of San Francisco (1983) 149 Cal.App.3d 1091, 1094-1095, 197 Cal.Rptr. 401 ["legal title" is the antithesis of "equitable title"].) A "special owner" has a qualified interest in property (such as a bailee), while the "general owner"
*428 holds the primary or residual title to the property. (Black's Law Dict., supra , at p. 1138; 73 C.J.S. (2017) Property, § 39 [general owner].) A "limited owner" is defined as a tenant for life or the owner of a life estate. (Ibid .)
To summarize the concepts of property and owner, California law recognizes a wide range of interests are included in the bundle of sticks that constitutes "property" and those sticks may be divided and held (i.e., owned) among multiple persons.
C. Standing to Sue **
II. PG&E'S NEGLIGENCE CAUSE OF ACTION***
III. RECOVERY UNDER SECTION 7952
The trial court concluded PG&E could not establish any entitlement to the measure of damages set forth in section 7952 because PG&E could not prove it was the owner of the transformer. HART supports the court's conclusion by arguing the statutory phrase "equipment of any ... electrical ... corporation" should be interpreted to mean equipment owned by the electrical corporation and, because the undisputed evidence shows MID was the sole owner of the transformer, PG&E cannot recover damages under section 7952. PG&E disagrees with HART's statutory interpretation, contending a proper interpretation must promote, rather than defeat, the purpose of the statute-namely, allowing public utilities to recover an enhanced *641 measure of damages from tortfeasors and thereby preventing those costs from being passed to the general public.
A. Statutory Construction
Our Supreme Court's approach to the judicial interpretation of California statutes is well established. ( People v. Castillolopez (2016) 63 Cal.4th 322, 329, 202 Cal.Rptr.3d 703, 371 P.3d 216.) A court's " 'role in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law.' " ( Ibid . ) Courts " 'look first at the words themselves, *429 giving them their usual and ordinary meaning' " because statutory language generally is the most reliable indicator of that intent. ( Ibid . )
1. Statutory Language With a Plain Meaning
When the statutory language, standing alone, is clear and unambiguous, courts usually adopt the plain or literal meaning of that language. ( Hughes v. Board of Architectural Examiners (1998) 17 Cal.4th 763, 775, 72 Cal.Rptr.2d 624, 952 P.2d 641 ; Lungren v. Deukmejian (1988) 45 Cal.3d 727, 735, 248 Cal.Rptr. 115, 755 P.2d 299 ( Lungren ).) In this context, ambiguous means susceptible to more than one reasonable interpretation. ( Honchariw v. County of Stanislaus (2013) 218 Cal.App.4th 1019, 1027, 160 Cal.Rptr.3d 609.)
The plain meaning of the words of a statute may be disregarded only when the application of their literal meaning would (1) frustrate the manifest purposes that appear from the provisions of the legislation when considered as a whole in light of its legislative history or (2) produce absurd consequences that the Legislature clearly did not intend. ( Arias v. Superior Court (2009) 46 Cal.4th 969, 979, 95 Cal.Rptr.3d 588, 209 P.3d 923 [literal construction will not control when it frustrates manifest purpose of enactment as a whole]; Horwich v. Superior Court (1999) 21 Cal.4th 272, 276, 87 Cal.Rptr.2d 222, 980 P.2d 927 [statutory language should not be given literal meaning if it results in absurd consequences].)
2. Ambiguous Statutory Language
Whether statutory language is ambiguous is a question of law subject to independent review on appeal. ( Wells Fargo Bank, N.A. v. 6354 Figarden General Partnership (2015) 238 Cal.App.4th 370, 381, 190 Cal.Rptr.3d 13 ( Wells Fargo ).) When statutory language is susceptible to more than one reasonable interpretation, courts must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute. ( Ibid. ) The apparent intent of the Legislature is determined by reading the ambiguous language in light of the statutory scheme rather than reading it in isolation. ( Lungren , supra , 45 Cal.3d at p. 735, 248 Cal.Rptr. 115, 755 P.2d 299.) Stated another way, the ambiguous language must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. ( Ibid . ) In addition, courts determine the apparent intent underlying ambiguous statutory language by evaluating a variety of extrinsic aids, including the ostensible objects to be achieved by the statute, the evils to be remedied, public policy, and the statute's legislative history. ( Wells Fargo , supra , at p. 381, 190 Cal.Rptr.3d 13.)
*430 B. Statutory Text
Part of the historical context for the question of statutory interpretation presented in this appeal is established by the initial version of section 7952, which was enacted in 1951 and stated the following:
*642 "Any person who injures or destroys, through want of proper care, any necessary or useful fixture of any telegraph or telephone or electric power corporation or the pipe line, valves or fittings of any gas corporation, is liable to the corporation for all damages sustained thereby. Any vessel which, by dragging its anchor, or otherwise, breaks, injures, or destroys the subaqueous cable of a telegraph or telephone or electric power corporation or the pipe line of a gas corporation, subjects its owner to liability for the damages sustained thereby." (Stats. 1951, ch. 764, § 7952, p. 2195, italics added.)
The Legislature did not explain the meaning of the phrase "all damages." For instance, it did not define "damages" or specify particular items that could be recovered. In 1969, the Legislature amended section 7952 by (1) adding a provision defining the proper measure of damages; (2) changing the word "fixture" to the phrase "facility or equipment;" and (3) making other minor changes. As a result of the 1969 amendment, section 7952 now provides in full:
"Any person who injures or destroys, through want of proper care, any necessary or useful facility or equipment of any telegraph, telephone, electrical , or gas corporation , is liable to the corporation for all damages sustained thereby. The measure of damages to the facility or equipment injured or destroyed shall be the cost to repair or replace the property injured or destroyed including direct and allocated costs for labor, materials, supervision, supplies, tools, taxes, transportation, administrative and general expense and other indirect or overhead expenses, less credit, if any, for salvage, as determined by such telegraph, telephone, electrical or gas corporations in conformity with a system of accounts established by the commission. The specifying of the measure of damages for the facility or equipment shall not preclude the recovery of such other damages occasioned thereby as may be authorized by law.
"Any vessel which, by dragging its anchor, or otherwise, breaks, injures or destroys any underwater cable of a telegraph, telephone or electrical corporation or pipeline of a gas corporation, subjects its owner to liability for the damages sustained thereby." (Stats. 1969, ch. 709, § 1, pp. 1389-1390, italics added.)
Accordingly, after the 1969 amendment, section 7952 contained "the measure of damages for damage done to a facility of a telegraph, telephone, *431 electric or gas corporation." (Legis. Counsel's Dig., Sen. Bill No. 939, 2 Stats. 1969 (Reg. Sess.) Summary Dig., p. 102.) The statute does not define what the preposition "of" means in the phrase "equipment of any ... electrical ... corporation." ( § 7952.) For instance, it does not state the phrase refers to equipment (1) owned by , (2) physically possessed by , or (3) associated or connected with , the electrical corporation. Consequently, even if the phrase was intended to refer to ownership, the statute does not identify whether that ownership must be sole and complete ownership or partial ownership-that is, control over some, but not all, of the sticks in the bundle of interests that constitute "property." (See pt. I.A., ante .)
C. Legislative History
We granted PG&E's unopposed request for judicial notice of documents compiled by LRI History LLC that relate to the 1969 amendment of section 7952. Consistent with the positions taken by the parties, we consider all of the documents compiled and presented. As noted by HART, *643 the legislative materials before this court do not include documents relating to the initial version of section 7952.
An unitemized document in the Governor's chapter bill file on Senate Bill No. 939 (1969 Reg. Sess.) described the reasons for amending section 7952 as follows:
"The Public Utilities Code presently establishes liability for 'all damage' to equipment owned by utilities , but does not define 'damages'. Such definition is necessary because of the direct interest the consuming public has in the recovery of this type [of] damage.
"Since the service is so highly specialized, the utilities can most economically and most effectively restore service to the public by repairing the damage to their own system . In repairing their own systems , utilities incur certain indirect costs. [¶] ... [¶]
"If the utility, and more importantly, the consuming public, is to be made whole for the cost of repairing such damage, the party causing the damage must be required to pay not only the direct cost, but also the indirect cost of making these repairs. Any indirect costs not recovered from the wrong doer must be recovered through rates charged to utility customers.
"The absence of a statutory definition of damages to utility property where the repair work is performed by utility forces has resulted in a great deal of litigation which could be avoided.
*432 "Justice, equity and common sense require this amendment in order to define the measure of damage to a utility's property and to prevent needless and expensive litigation which must be paid for by the utility and therefore, the consuming public." (Italics added.)
The enrolled bill memorandum to the Governor, dated August 7, 1969, for Senate Bill No. 939 stated, "The bill was sponsored by Southern California Edison Company. It is intended to more clearly define 'damages' by including indirect charges."
D. Analysis of Meaning
1. Contentions About the Word "Of"
The statutory interpretation adopted by the trial court and HART is based on the meaning of the word "of" as it appears in the phrase "equipment of any ... electrical corporation."[12] ( § 7952.) HART supports this interpretation by arguing:
"The word 'of' and the phrase 'facility or equipment of ... a [sic ] corporation' are ordinary words and phrases. The word 'of' connotes ownership and belonging to. In common usage, the phrase 'property of' connotes property which is owned by a particular individual or entity. PG&E had no ownership interest in the Exchequer Transformer and had no right to ownership of the transformer, now or in the future."
PG&E argues HART's interpretation rewrites the statutory text by replacing the word "of" with the phrase "owned by," which does not appear in the relevant portion of the statute. PG&E further argues the meaning of section 7952"may not be determined from a single word" ( *644 Lungren , supra , 45 Cal.3d at p. 735, 248 Cal.Rptr. 115, 755 P.2d 299 ) but should promote the purpose of the statute.
2. Is "Of" Ambiguous?
Whether the word of and the phrase of any electrical corporation are ambiguous-that is, reasonably susceptible to more than one meaning-presents a question of law. ( Wells Fargo , supra , 238 Cal.App.4th at p. 381, 190 Cal.Rptr.3d 13.) As explained below, we conclude the word "of" and, therefore, the phrase in which it was used are ambiguous.
*433 First, we note HART has not supported its argument about the meaning of the word "of" with a citation to any legal authority or dictionary definitions.[13] (See Cal. Rules of Court, rule 8.204(a)(1)(B) [brief must support each point by argument and, if possible, by citation of authority].) Thus, HART's approach implies HART thought it was not possible to cite authority supporting its argument about plain meaning.
Second, the California Supreme Court has addressed the meaning of the preposition "of" when it appears in a statute. (See People v. Hallner (1954) 43 Cal.2d 715, 718, 277 P.2d 393 ( Hallner ); Harlan v. Industrial Acc. Com. (1924) 194 Cal. 352, 361, 228 P. 654 ( Harlan ).) In both cases, the court considered whether to interpret "of" as a word of proprietorship or possession (which is interpretation advocated by HART) and rejected that interpretation.
In Hallner , supra , 43 Cal.2d 715, 277 P.2d 393, the dispute involved a statute making it a crime to offer a bribe to any " 'executive officer of this state.' " ( Id . at p. 717, 277 P.2d 393.) The question presented was whether the phrase "of this state" covered an executive officer of a city . ( Ibid . ) Our Supreme Court stated "the word 'of' has different meanings" and illustrated the point by stating it could be "used in its possessive sense or to indicate geographic location." ( Id . at p. 718, 277 P.2d 393.) In the context of the bribery statute, the court concluded "of the state" meant "in the state." ( Id . at p. 721, 277 P.2d 393.) As a result, the court interpreted the statute to prohibit offering a bribe to an executive officer of a city. ( Ibid . ) Thus, Hallner illustrates that the preposition "of" is susceptible to more than one interpretation and rejects interpreting "of" in its possessive sense.
In Harlan , supra , 194 Cal. 352, 228 P. 654, the dispute involved a workers' compensation statute that limited dependents entitled to death benefits to persons who were " 'in good faith a member of the family or household of [the deceased] employee.' " ( Id . at p. 355, 228 P. 654, italics added.) The deceased employee was an illegitimate minor, and the applicant for benefits was the aunt who had raised him as the twin of her own son, who was nearly the same age. ( Id . at pp. 357-358, 228 P. 654.) The court addressed "the effect to be given to the words 'of [the deceased] employee' as used" in the statute. ( Id . at p. 360, 228 P. 654.) In particular, the court considered whether "the applicant [must be] a member of the family or household of which said deceased employee was the head or master ." ( Id . at p. 361, 228 P. 654, italics added.) The court rejected this interpretation, stating:
"Such a restricted construction would tend to defeat rather than to promote the *434 purpose of the act. We think that *645 petitioner has lost sight of the object and purpose of the law. It is not to be doubted that the words 'of such employee' are words of identification and relation rather than words of proprietorship or possession within the contemplation of the act. In this connection the preposition 'of' is very commonly used and has a meaning well understood. The Standard Dictionary thus defines it: '(1) associated or connected with, usually in some causal relation, efficient, material, formal or final.' It will be noted that the act does not employ the term 'head of the family' for the reason, doubtless, that the head of the family or person who by common consent exercises authoritative domestic control may not, in fact, be a bread-winner at all, but in many cases a dependent. The act cares for the support of dependents, and does not concern itself with the real or nominal heads of families or households except so far as that station may have a causal relation to the support of dependents of the household." ( Ibid . )
This quote shows our Supreme Court considered interpreting "of" as a word of proprietorship or possession and rejected that statutory construction. As a result, Harlan demonstrates that the preposition "of" is not always interpreted as designating a proprietary relationship and, therefore, is susceptible to more than one interpretation.
Third, the possibility that the preposition "of" is susceptible to more than one interpretation is supported by the multiple definitions set forth in Black's Law Dictionary (4th rev. ed. 1968) at page 1232:
"A term denoting that from which anything proceeds; indicating origin, source, descent, and the like; as he is of a race of kings; he is of noble blood. [Citation.] Associated with or connected with, usually in some casual relation, efficient, material, formal, or final. [Citation.]
"The word has been held equivalent to after, [citation]; at, or belonging to, [citation]; in possession of, [citations]; manufactured by, [citation]; residing at, [citation]; from, [citation]; in [citation]."[14]
*435 The case law and dictionary definition establish that, in the abstract, the preposition "of" can be defined in many ways. Therefore, our next step in resolving whether the word "of" as used in section 7952 is ambiguous places the word in the context of the rest of the statutory language and determines whether, in that context, it is reasonable to interpret the word in more than one way. We conclude more than one interpretation is reasonably possible because "of" could be interpreted broadly to mean associated or connected with ( Harlan , supra , 194 Cal. at p. 361, 228 P. 654 ) or, alternatively, it could be interpreted more restrictively to mean belonging to or owned by (see Poe v. Seaborn (1930) 282 U.S. 101, 109, 51 S.Ct. 58, 75 L.Ed. 239 [in federal revenue statute taxing *646 the net income of every individual, "use of the word 'of' denotes ownership"] ).
3. Resolving the Ambiguity
When resolving the meaning of ambiguous statutory language, courts (1) select the construction that most closely comports with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute and (2) avoid interpretations that lead to absurd consequences. ( Wells Fargo , supra , 238 Cal.App.4th at p. 381, 190 Cal.Rptr.3d 13.) In other words, courts adopt the interpretation that best effectuates the legislative intent or purpose. ( Beal Bank, SSB v. Arter & Hadden, LLP (2007) 42 Cal.4th 503, 508, 66 Cal.Rptr.3d 52, 167 P.3d 666.) In reaching a conclusion about which interpretation best effectuates the legislative intent or purpose, courts may consider a variety of extrinsic sources, including the legislative history. ( Ibid . ) The legislative history might provide insight into the ostensible objects to be achieved by the statute, such as remedying a particular evil, and the public policy underlying the statute. ( Wells Fargo , supra , at p. 381, 190 Cal.Rptr.3d 13.)
4. Apparent Intent of the Legislature
The materials in the legislative history do not explicitly state section 7952's phrase "equipment of any ... electrical ... corporation" means equipment owned in whole or in part by the corporation. However, the materials restate the statutory text and some of the restatements support inferences about what the Legislature intended the preposition "of" to mean. The unitemized document quoted in part III.C., ante , refers to (1) "equipment owned by utilities"; (2) "damage to their own system"; and (3) "the measure of damage to a utility's property." The document includes the sentence: "In repairing their own systems , utilities incur certain indirect costs." (Italics added.) These references support the inference that the preposition "of" was used to mean owned by-that is, to designate an ownership or proprietary interest in the equipment. However, this inference about the apparent intent of the Legislature does not bring us to the end of our inquiry. The inference *436 leaves open the specific question of whether the corporation's ownership must be sole (i.e., complete) ownership or extends to partial ownership.
5. Promoting the Legislative Purpose
The absence of statutory text or legislative materials that directly or indirectly address the sole or partial ownership question leads us to consider which interpretation best effectuates the legislative purpose. The legislative materials identify that purpose as requiring the person causing the damages to pay the direct and indirect costs of repair and thereby preventing those costs from being "recovered through rates charged to utility customers." PG&E agrees with this assessment of the legislative materials. Its opening brief argued the purpose of section 7952"is to allow public utilities such as PG&E to more easily recover damages from tortfeasors and avoid passing those costs onto the general public." In contrast, HART's appellate brief focuses on the statutory text and does not address how the legislative purpose relates to the possibility of partial ownership.
We conclude the legislative purpose of protecting consumers from paying increased utility rates to cover damages caused by the want of care of third parties is best effectuated by interpreting "of" so that it is not limited to complete ownership of the facility or equipment in question. Direct and indirect costs incurred by a utility in its capacity as a partial owner *647 have the potential to be passed through to consumers in the rates charged. Therefore, categorically limiting recovery to utilities that are the sole owner of the damaged equipment would not best effectuate the purpose of section 7952.
Based on the statutory purpose, we conclude the statutory phrase "equipment of any ... electrical ... corporation" encompasses equipment solely owned by the corporation and some equipment partially owned by the corporation. To fall within the statutory phrase, partially owned equipment must met the following conditions: (1) the property interests held by the corporation must be substantial, not trivial; (2) the corporation must incur actual liability for direct or indirect expenses (or both) in repairing or replacing the damaged equipment; and (3) a substantial portion of those expenses have been passed, are being passed, or are reasonably likely to be passed, along to consumers.[15] These conditions assure the recovery allowed a partial owner is aligned with the legislative purpose underlying the statute.
*437 E. Applying the Statutory Interpretation to HART's Moving Papers
HART's motion for summary adjudication of PG&E's cause of action under section 7952 was based on the legal theory that MID was the sole owner of the transformer and PG&E did not own the transformer. HART's legal theory used an overly restrictive interpretation of section 7952 and did not address PG&E's ownership of some interests regarded as property under California law. Although HART's moving papers established PG&E was not the sole owner of the transformer, HART's showing did not eliminate the possibility that PG&E could prove it was a partial owner satisfying the three conditions identified earlier in this opinion. As a result of HART's failure to carry its burden, we need not proceed to the third step of the summary adjudication analysis and examine whether PG&E's opposition papers have demonstrated the existence of a triable issue of material fact. (See Pierson , supra , 4 Cal.App.5th at p. 618, 209 Cal.Rptr.3d 222.)
In summary, HART has not carried its burden of demonstrating grounds that completely dispose of PG&E's cause of action for damages under section 7952. (See Code Civ. Proc., § 437c, subd. (f)(1).) Accordingly, that cause of action should not have been summarily adjudicated.
DISPOSITION
The judgment is reversed. The trial court is directed (1) to vacate the part of its October 2015 order granting defendant's motion for summary adjudication as to PG&E's causes of action for negligence and for damages under section 7952 and (2) to enter a new order denying summary adjudication as to those causes of action.
PG&E shall recover its costs on appeal.
WE CONCUR:
*648 SMITH, J.
MEEHAN, J.

All unlabeled statutory references are to the Public Utilities Code.

The same motion for summary adjudication was before this court in Merced Irrigation District v. Superior Court(2017) 7 Cal.App.5th 916, 213 Cal.Rptr.3d 306, where we concluded another plaintiff, Merced Irrigation District (MID), was not a "municipal corporation" for purposes of section 10251 and, therefore, not entitled to recover damages under section 10251. Based on that statutory interpretation, we upheld the grant of summary adjudication eliminating MID's cause of action under section 10251.

The first sentence of section 7952 states: "Any person who injures or destroys, through want of proper care, any necessary or useful facility or equipment of any... electrical... corporation, is liable to the corporation for all damages sustained thereby." (Italics added.) The second sentence specifies a broad measure of damages, which includes indirect or overhead expenses. Thus, the damages recoverable under section 7952 might be much broader than those recoverable under the negligence cause of action.

Panoche Energy Center, LLC v. Pacific Gas & Electric Co.(2016) 1 Cal.App.5th 68, 72, 205 Cal.Rptr.3d 39.

The contract defined the term "project" as "[a] development using the waters of Merced River and including Exchequer Reservoir, McSwain Reservoir, Exchequer Power Plant, McSwain Power Plant, dams, project communication facilities, project headquarters and project roads, tools, operation and maintenance equipment, including motor vehicles, and all necessary appurtenances for each of the foregoing." The term "Exchequer Power Plant" was defined as "[a] hydroelectric generating facility to be constructed on Merced River at the reconstructed Exchequer Dam, including an intake structure, a penstock, a power house, and appurtenant facilities."

Neither the Exchequer Contract 2009-08 nor HART's quotation explicitly identified PG&E as a party to the contract or as a third party beneficiary.

The authentication submitted with the documents comprising the legislative history stated LRI History LLC was formerly (1) Legislative Research Institute; (2) Legislative Research, Incorporated; and (3) Legislative Research & Intent LLC.

This court also granted MID's request for judicial notice of the same legislative history in a writ proceeding involving HART's motion for summary adjudication. (Merced Irrigation District v. Superior Court, supra, 7 Cal.App.5th at p. 923, 213 Cal.Rptr.3d 306.)

The concept of property varies from context to context. For example, the scope of the concept of property under the takings clause is more restricted than the concept of property recognized under the due process clause. (See California Chamber of Commerce v. State Air Resources Bd.(2017) 10 Cal.App.5th 604, 646-647, 216 Cal.Rptr.3d 694.)

Professor Wonnell of the University of San Diego Law School observed: "Theorists may tell us that property is a bundle of severable sticks, but it is remarkable how frequently that insight is forgotten when it is most needed." (Wonnell, Replacing the Unitary Principle of Unjust Enrichment(1996) 45 Emory L.J. 153, 196.) He then describes the right to recover an asset's monetary value as a normal aspect of property-that is, a stick in the bundle. (Ibid.)

See footnote, ante.

See footnote, ante.

As to the other words in this phrase, we conclude (1) the transformer was "equipment" for purposes of section 7952 and (2) PG&E is an electrical corporation. The latter conclusion is based on cases in which PG&E was allowed to recover damages under section 7952 and on certain statutory definitions. (See Pacific Gas & Electric Co. v. Alexander(1979) 90 Cal.App.3d 253, 153 Cal.Rptr. 319 [damage to wood utility poles]; Pacific Gas & Electric Co. v. Mounteer(1977) 66 Cal.App.3d 809, 136 Cal.Rptr. 280 ; §§ 204 [corporation], 205 [person], 206 [person, corporation], 218 [electrical corporation].)

"Courts frequently consult dictionaries to determine the usual meaning of words." (In re Marriage of Bonds(2000) 24 Cal.4th 1, 16, 99 Cal.Rptr.2d 252, 5 P.3d 815.) "When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word." (Wasatch Property Management v. Degrate(2005) 35 Cal.4th 1111, 1121-1122, 29 Cal.Rptr.3d 262, 112 P.3d 647.)

Following the example of our Supreme Court, we cite this version of Black's Law Dictionary because it is the edition that was current when the legislation in question was enacted. (See Graham v. DaimlerChrysler Corp.(2004) 34 Cal.4th 553, 570, fn. 4, 21 Cal.Rptr.3d 331, 101 P.3d 140 [cite to the 1968 revised edition of Black's Law Dict.].) Various editions of Black's Law Dictionary has been referred to in federal cases for a definition of "of." (See American Soda, LLP v. U.S. Filter Wastewater Group, Inc.(10th Cir. 2005) 428 F.3d 921, 926, fn. 1 ; Dixon v. TSE International Inc.(5th Cir. 2003) 330 F.3d 396, 397-398 ; Shaw v. Dawson Geophysical Co.(S.D.W.Va. 2009) 657 F.Supp.2d 740, 748.)
As to the many definitions for the preposition "of," Webster's Third New International Dictionary (1986) at page 1565 lists 20 definitions including "relating to" and "used as a function word indicating a possessive relationship."

Restating this last element from another perspective, if the economic impact of the expenses incurred to repair or replace the equipment is a reduction of the corporation's profits, then recovery under the statute is not authorized because the purpose of the statute is not the protection of shareholder or investor profits.
For purposes of the further proceedings to be conducted on remand, we note the three conditions are not necessarily the final and binding interpretation of section 7952. The trial court shall have the flexibility to modify these conditions if (1) legislative history relating to the 1951 enactment of section 7952 is presented on remand and (2) the materials in that legislative history justify a modification by showing a different "apparent intent" or a broader set of legislative purposes.