Filed 2/18/20; Opinion following rehearing

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>ADOLFO RODRIGUEZ BERMUDEZ,<br><br>      Defendant and Appellant. | C079168, C079169<br><br>(Super. Ct. Nos. CRF130605,<br>     CRF140612)<br><br>OPINION ON REHEARING |

APPEAL from a judgment of the Superior Court of Yolo County, Stephen L. Mock and David W. Reed, Judges. Affirmed.

Jacquelyn Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, and Julie A. Hokans, Supervising Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts II., III., V. & VI. of the Discussion.

1

This is a consolidation of two appeals from two jury trials of defendant Adolfo Rodriguez Bermudez. The first trial involved the possession of a concealed dirk. The second involved an assault with a deadly weapon with a vehicle done to benefit a gang. Defendant was sentenced to a 21-year four-month aggregate term.

On appeal, defendant contends (1) the statute defining a dirk (Pen. Code, § 16470)[1] is unconstitutionally vague; (2) the trial court erred in allowing two officers to testify to the legal definition of a dirk; (3) a gang expert provided improper opinion testimony that defendant committed a crime to benefit a gang; and (4) insufficient evidence established the existence of a criminal street gang under section 186.22 because testimony concerning the predicate felonies was admitted in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). In supplemental briefing, defendant contends that (5) remand is required so the trial court may consider exercising its discretion under Senate Bill No. 1393 (Stats. 2018, ch. 1013, §§ 1-2) (SB 1393); and (6) the imposition of fines and fees violated his right to due process and freedom from excessive fines under *People v. Dueñas* (2019) 30 Cal.App.5th 1157. Finally, in a petition for rehearing, defendant contends (7) his one-year prior prison term enhancement should be struck in light of Senate Bill No. 136 (Stats. 2019, ch. 590, § 1) (SB 136).

In the published portion of this opinion, we hold that the dirk statute is not unconstitutionally vague. Our high court previously rejected a void for vagueness challenge to the dirk statute. (*People v. Rubalcava* (2000) 23 Cal.4th 322 (*Rubalcava*).) Defendant, however, raises new arguments, which we reject. Doing so, we first conclude the statute is definite enough to provide a standard of conduct for those whose activities are proscribed. We specifically reject defendant's contention that the term "may" in the statutory language, "capable of ready use as a stabbing weapon that *may* inflict great

---

[1] Undesignated statutory references are to the Penal Code.

bodily injury," makes the statute unconstitutionally vague. When read in context with the rest of the words in the statute, the word "may" is definite enough to place a defendant on notice of the type of instrument that is prohibited. We also reject defendant's argument, based on the vagueness analysis employed by the United States Supreme Court in *Johnson v. United States* (2015) 576 U.S. ___ [135 S.Ct. 2551] (*Johnson*), that the word "may" connotes an undefined and unconstitutionally vague risk assessment. The *Johnson* analysis has no application to laws that require gauging the riskiness of conduct in which a person engages.

Second, we conclude the knowledge element renders the statute definite enough to provide a standard for police enforcement and ascertainment of guilt. To be subject to arrest, a person's conduct must give rise to probable cause that he knew the concealed instrument may be used as a stabbing weapon. To be convicted, that knowledge must be proved beyond a reasonable doubt.

Also in the published portion of this opinion, we hold that a gang expert's testimony about gang enhancement predicate offenses does not violate *Sanchez*, *supra*, 63 Cal.4th 665, so long as the predicate offenses do not involve defendant or individuals involved in the defendant's case. Such predicate offenses are chapters in a gang's biography and constitute historical background information, not case-specific information.

We will strike the one-year prior prison term enhancement and remand to allow the trial court to consider exercising its discretion under SB 1393. During that remand, as the People concede, defendant may request a hearing on his ability to pay. In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Concealed Dirk Case

When a sheriff's deputy noticed a black Mustang with nonfunctioning break lights, he followed it until the Mustang made a sudden turn into a driveway, and the

deputy lost contact. When the deputy located the Mustang several minutes later, it was stopped. The deputy saw the driver's side door open, and defendant was walking around the front. The deputy asked defendant for his driver's license. Defendant said he didn't have one. The deputy subsequently performed a pat down search and found something in defendant's right front pant pocket.

The object was solid metal, about as thick as a pen, and it appeared to have been broken off a longer piece of metal. One end had been ground down on the sides to form a point, which had been dulled down. The other end had red tape wrapped around it to form a handle. The deputy testified the object was completely concealed within defendant's pant pocket with the handle up, allowing defendant to retrieve it "with the point out." The deputy testified that the object could "most definitely" be used as a stabbing instrument and further testified it could inflict "injury or death."

A friend who had been in the Mustang was called as a witness by defendant and testified that defendant was using the metal object for his stereo to push a button that wasn't working. On cross-examination, the friend denied any memory of telling the arresting officer the metal object was something she used for her hair.

A jury found defendant guilty of carrying a concealed dirk or dagger (§ 21310) and driving on a suspended or revoked license (Veh. Code, § 14601.2 subd (a)). The trial court separately found defendant had a prior strike conviction and had served a prior prison term.

**The Assault with a Deadly Weapon Case**

The victim was driving in Woodland, with his son in the car, when he saw a black Honda parked on the side of the road. As he drove by, the Honda suddenly accelerated hitting him.

Thinking he had been in an accident, the victim pulled over. The Honda collided into him a second time. The second impact was a "T-bone," taking off the front and back doors and breaking windows.

4

The victim recognized defendant as the driver, testifying at trial: "he looked at me when he crashed and then he flossed his tattoo on his head and . . . I recognized him." Defendant had turned, pointed to the back of his head, and yelled "EST," which the victim took to mean defendant's gang, Eastside Trece. Defendant then drove away. The victim drove to the next block and called 911. In the 911 call, the victim told the operator he knew defendant's wife and where she lives.

Shortly after the incident, the victim spoke with a responding officer. He told the officer he recognized defendant[2] and thought the crash had something to do with an earlier altercation, involving the victim, defendant, and other Sureño gang members.

A couple of months before the assault with a vehicle, the victim was dropping off his cousin, who associates with Norteños, when a car pulled up and a group of what looked to be gang members, including defendant, got out of the car and "started talking gang shit." The group hurled insults related to Northerners at both the victim and his cousin. At some point, a security guard showed up and "kicked everyone out."

The victim had previously associated with southern gangs, but because his family members are Northerners, he now associates with Northerners. The victim testified, "since they seen me with him, . . . they thought I was affiliating with Northerners now, too." He also testified that he thought defendant felt disrespected.

The victim testified about other altercations. In 2006, he was present when a group of Southerners he associated with were in a fight with a Northerner — though he claimed he was not part of the fight. In 2010, the victim was in a fight with an Eastside Trece member. He explained that several Eastside Trece members had approached him, and he defended himself.[3] An officer who responded to the 2010 incident testified the

---

[2] The victim later identified defendant in a photo lineup.

[3] After a break in his testimony, the victim conceded he had been "a bit guarded" in his earlier testimony about his gang affiliation and knowledge of gangs. But he agreed he

5

victim had been in a fight with several Eastside Trece members and hit one of them with a tire iron.

An officer who was also involved in the concealed dirk case testified about contacts he personally had with defendant in 2005, 2007, and 2009. During the first two contacts, defendant admitted his involvement in the Sureño gang. The officer had also found "gang music" during a search of defendant's bedroom and, in 2007, defendant had a "EST" tattoo on his head. We summarize additional gang evidence, *post*.

A jury found defendant guilty of two counts of assault with a deadly weapon (§ 245, subd. (a)(1)) and found both were done for the benefit of, at the direction of, or in association with a gang (§ 186.22, subd. (b)). It also found defendant guilty of driving on a suspended license. (Veh. Code, § 14601.2.)

### Sentencing

The trial court sentenced defendant to a 21-year four-month aggregate term. For the assault with a deadly weapon case, the court imposed an eight-year term for one assault count (the upper term doubled for the strike) along with a five-year gang enhancement. (§ 186.22 (b)(1).) It also imposed a five-year prior serious felony enhancement and a two-year on-bail enhancement. (§ 12022.1(b).) A one-year prior prison term enhancement was stayed pursuant to section 654. Concurrent terms of eight years for the other assault count, and 180 days for driving on a suspended license were also imposed.

In the dirk case, the court imposed a consecutive 16-month term for the concealed dirk (§ 21310) (one-third the middle, doubled for the strike) along with a 30-day concurrent term for driving on a suspended or revoked license.

---

would "be truthful" going forward. He also testified he was nervous about testifying because he feared retaliation for snitching.

## DISCUSSION

## I.  The Void for Vagueness Challenge

### A.  Defendant's Contentions

Section 21310 proscribes carrying concealed a "dirk or dagger."[4]  Section 16470, in pertinent part, defines a dirk or dagger as "a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that *may inflict great bodily injury or death*."  (Italics added.)  Focusing on the italicized text, defendant contends section 16470's definition of a dirk is unconstitutionally vague in that it (1) contains vague terms that fail to give notice of what is prohibited, and (2) grants police and prosecutors unfettered discretion over who to pursue.  We disagree.

In addressing these contentions, we first discuss the statute's legislative purpose and how it came to include the language now challenged on appeal.  (See *People v. Grubb* (1965) 63 Cal.2d 614, 621 (*Grubb*) [in determining a vagueness challenge related to statutory terms, consideration of legislative history and statutory purpose is appropriate].)

### B.  Purpose and Historical Overview of the Concealed Dirk Statutes

The prohibition against carrying concealed dirks and daggers was enacted to combat the dangers of concealed weapons.  (*People v. Mitchell* (2012) 209 Cal.App.4th 1364, 1371 (*Mitchell*).)  By prohibiting concealment, third parties are protected from the risk of surprise attack by a person carrying such weapons.  (*Ibid*.)

The concealed dirk statute was formerly codified in section 12020.  Until January 1994, there was no statutory definition of a dirk or dagger; rather, those terms had been

---

[4]  In pertinent part, section 21310 provides:  "any person in this state who carries concealed upon the person any dirk or dagger is punishable by imprisonment in a county jail not exceeding one year or imprisonment."  The terms "[d]irk and dagger are used synonymously and consist of any straight stabbing weapon."  (*People v. Castillolopez* (2016) 63 Cal.4th 322, 327-328 (*Castillolopez*).)

judicially defined.  (*Rubalcava, supra*, 23 Cal.4th at pp. 328-329.)  In 1993, "the Legislature [statutorily] defined ' "dirk" or "dagger" ' to mean 'a knife or other instrument with or without a handguard *that is primarily designed, constructed, or altered to be a stabbing instrument designed to inflict great bodily injury or death*.' " (*Castillolopez, supra*, 63 Cal.4th at p. 328, citing § 12020, subd. (c)(24), as added by Stats. 1993, ch. 357, § 1, p. 2155, italics added.)

This definition proved overly narrow, making it difficult for prosecutors to establish that the primary purpose of items such as butcher knifes, hunting knifes, or ice picks was to cause death or great bodily injury when carried for potential use as a weapon.  (*Castillolopez, supra*, 63 Cal.4th at p. 328.)  Concerned that gang members carrying concealed, lethal knives were "essentially immune from arrest and prosecution," the Legislature amended the statute in 1995, replacing "primarily designed, constructed, or altered to be a stabbing instrument" with "*capable of ready use as a stabbing weapon*." (*Rubalcava*, *supra*, 23 Cal.4th at p. 330, citing Sen. Rules Com., 3d reading analysis of Assem. Bill No. 1222 (1995-1996 Reg. Sess).)  "[T]he Legislature recognized that the new definition may criminalize the 'innocent' carrying of legal instruments such as steak knives, scissors and metal knitting needles, but concluded 'there is no need to carry such items concealed in public.' " (*Rubalcava*, at p. 330, citing Sen. Com. on Crim. Procedure, Analysis of Assem. Bill No. 1222 (1995-1996 Reg. Sess.) as amended May 31, 1995, pp. 3, 5-6.)  But the change ultimately raised concerns that the definition was too broad as applied to legal folding knives and pocketknives.  (*Ibid*.)

So in 1997, the Legislature again amended the statute, this time to provide that folding knives and pocket knives would qualify as "capable of ready use as a stabbing weapon" only if the blade was exposed and locked into position.  (*Castillolopez, supra*, 63 Cal.4th at p. 329, citing § 12020, subd. (c)(24) as amended by Stats. 1997, ch. 158, § 1, p. 778.)  Section 12020 was later repealed and reenacted without substantive change

8

as section 16470 — the statute now challenged on appeal.  (Stats. 2010, ch. 711, § 6, pp. 4146, 4150.)

## C. Analysis

### 1. Void for Vagueness Principles

Due process requires "*a reasonable degree of certainty* in legislation, especially in the criminal law . . . ."  (*People v. Superior Court (Caswell)* (1988) 46 Cal.3d 381, 389; *People v. Custodio* (1999) 73 Cal.App.4th 807, 811 (*Custodio*), italics added.)  To satisfy due process and survive a vagueness challenge, a criminal statute must " ' " 'be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt.' " ' "  (*People v. Morgan* (2007) 42 Cal.4th 593, 605 (*Morgan*).)  More specifically, a law must " 'provide adequate notice to those who must observe its strictures' " and must not " ' "impermissibly delegate[] basic policy matters to police[] [officers], judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." ' "  (*Rubalcava, supra*, 23 Cal.4th at p. 332.)

When considering a void for vagueness challenge, courts employ a " 'strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears." ' "  (*Morgan, supra*, 42 Cal.4th at p. 605; *People v. White* (2016) 3 Cal.App.5th 433, 453 (*White*).)  Concomitantly, to prevail on a vagueness challenge, a defendant must show the statute " ' "is impermissibly vague *in all of its applications*." ' "  (*Morgan*, at pp. 605-606; *White*, at p. 454.)

Merely identifying some instances where the statute's application is uncertain or ambiguous is insufficient to sustain a vagueness challenge.  (*Morgan, supra*, 42 Cal.4th at pp. 604-606 [asportation element in kidnapping requiring moving the victim a "substantial distance" held not unconstitutionally vague].)  Indeed, " '[m]any, probably most, statutes are ambiguous in some respects and instances invariably arise under which the application of statutory language may be unclear.' "  (*People v. Ervin* (1977) 53

9

Cal.App.4th 1323, 1328 [rejecting vagueness challenge as to "immediately after" and "in the vicinity" in statute punishing robberies taking place while the victim is using an ATM "or immediately after the person has used an [ATM] and is in the vicinity of the [ATM]"].)

Accordingly, as to the requirement that the law be definite enough to provide notice of a standard of conduct for those whose activities are prescribed, all that is required is that the statute " 'define the proscribed offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited." ' " (*People v. Ledesma* (2017) 14 Cal.App.5th 830, 835 (*Ledesma*), citing *Kolender v. Lawson* (1983) 461 U.S. 353, 357 [103 S.Ct. 1855].) A statute is not void for vagueness " ' "if any reasonable and practical construction can be given to its language." ' " (*Morgan*, *supra*, 42 Cal.4th at pp. 605-606.) Nor are statutory terms impermissibly vague if " 'their meaning can be objectively ascertained by reference to common experiences of mankind.' " (*Id.* at p. 606.)

By these standards, section 16470's definition of a dirk is not unconstitutionally vague.

### 2. Notice of Prohibited Activity

#### a. The Terms "May" and "Great Bodily Injury"

Defendant contends section 16470's definition of a dirk is unconstitutionally vague because it contains vague terms that fail to give notice of what is prohibited. In an argument not previously addressed by an appellate court, defendant argues the terms "may" and "great bodily injury," in the phrase "may inflict great bodily injury" are too broad and uncertain to inform the public of how to evaluate the risk of harm. He argues that "may," as used in section 16470, "either means a likelihood that an event will occur or means that the event could occur in some hypothetical worst case scenario." He avers that individuals, in determining if an item may not be carried concealed, are left to guess

10

whether an item has ever inflicted great bodily injury or could do so in the future. The People, in turn, contend that "may" means "can" or "is able to."

While "may" is "used nearly interchangeably with can," and also "indicate[s] possibility or probability" (Merriam-Webster's Collegiate Dictionary (11th ed. 2004) p. 767), its use does not make section 16470 unconstitutionally vague. The meaning of "may" can be objectively ascertained by reference to common experiences, particularly when reading it with other relevant words in the statute. Specifically, the instrument the Legislature has prohibited when it "*may* inflict great bodily injury or death" is "a *knife or other instrument* . . . that is *capable of ready use as a stabbing weapon*." This language provides sufficient definiteness so that a person of ordinary intelligence can determine with a reasonable degree of certainty the nature of the instrument one must not carry concealed. (Cf. *Custodio, supra*, 73 Cal.App.4th at p. 812 ["a person of ordinary intelligence would know what is" prohibited by a statute proscribing "sharp instrument[s]" at penal institutions and "understand that [the statute] does not apply to a sharpened pencil—which ordinarily is used for a legitimate and necessary purpose— unless the inmate uses the pencil as a weapon"].)[5]

---

[5] Nor is the term "great bodily injury" unconstitutionally vague. (*People v. Guest* (1986) 181 Cal.App.3d 809, 812 [section 12022.7 is not unconstitutionally vague for use of the term "great bodily injury"]; *People v. Roberts* (1981) 114 Cal.App.3d 960, 963 [finding section 245, subdivision (a) not impermissibly vague as the term "great bodily injury" is sufficiently certain and definite to meet constitutional requirements].) " '[G]reat bodily injury' " means a significant or substantial physical injury." (§ 12022.7.) We reject defendant's argument that the term "great bodily injury" does not aid in making the proceeding terms in section 16470 "any more certain" because great bodily injury could simply involve extensive bruising and does not require puncture of skin or any particular harm that would tell the public whether an instrument is a dirk. In light of the statutory focus on a weapon that is capable of use as a "stabbing weapon," it must be obvious that the type of great bodily injury the Legislature seeks to prevent is one involving the perforation of the skin.

That a statute does not afford mathematical precision is not fatal.  Indeed, " '[t]he law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as "reasonable," "prudent," "necessary and proper," "substantial," and the like.' " (*Morgan, supra*, 42 Cal.4th at p. 606.)  For example, "a [person] may be given a speeding ticket if he overestimates the 'reasonable or prudent' speed to drive his car in the circumstances" under Vehicle Code section 22350.  (*Morgan,* at p. 606.)  A person may be incarcerated for willful homicide for misjudging the "reasonable" amount of force that may be used to repel an assault.  (*Ibid*.)  Standards such as "reasonable" are not impermissibly vague so long as " 'their meaning can be objectively ascertained by reference to common experiences of mankind.' " (*Ibid*.)  So too in this way, the term "may" is objectively ascertainable.

Moreover, in defendant's case, the sharpened object concealed in his pants pocket was indisputably capable of causing great bodily injury.  It was not a recognizable tool or object with a common alternative use.  It was a solid piece of metal broken off from a larger piece of metal.  That the law could be properly applied to defendant's instrument demonstrates the law is not " ' "impermissibly vague *in all of its applications*" ' "[6]  (See *Morgan, supra*, 42 Cal.4th at p. 606.)

---

[6] And the fact that certain innocent objects identified by defendant (keys, pens, scissors, needles, awls) — which are not at issue here — might present uncertainty as to whether they can cause great bodily injury does not render the statute unconstitutionally vague.  " ' "[A] statute is not void simply because there may be difficulty in determining whether some marginal or hypothetical act is covered by its language." ' " (*Morgan*, *supra*, 42 Cal.4th at p. 606; see also *Rubalcava*, *supra*, 23 Cal.4th at p. 331 [rejecting suggestion that without a specific intent requirement to use the instrument as a stabbing weapon, the statute would apply to a tailor who places scissors in his jacket, a shopper who walks out of a kitchen store with a recently purchased steak knife concealed, and a parent who wraps a sharp pointed knife in a paper towel and places it in his coat to carry into a PTA potluck dinner].)

Further, to be guilty of carrying a concealed dirk, a defendant must know the concealed instrument could be readily used as a stabbing weapon. (*Rubalcava*, *supra*, 23 Cal.4th at p. 331; see also CALCRIM No. 2501.) And "when a defendant is charged with an offense that penalizes possession of an instrument that is ordinarily usable for peaceful purposes, the defendant may justify the possession by showing the possession was 'in accordance with [the instrument's] ordinary legitimate design.' " (*Mitchell, supra*, 209 Cal.App.4th at p. 1372, citing *Grubb, supra*, 63 Cal.2d at p. 621, fn. 9.) "Consistent with this principle, . . . [CALCRIM No. 2501] directs that when the instrument may have innocent uses, the jury should be given an instruction stating: 'When deciding *whether the defendant knew the object* . . . could be used as a stabbing weapon, consider all the surrounding circumstances, including the time and place of possession. Consider also the destination of the defendant, the alteration of the object from standard form, and other facts, if any.' " (*Mitchell*, at p. 1372, italics added.) Defendant's jury was so instructed.[7]

### b. Risk Assessment under *Johnson*

Defendant attempts to bolster his argument that "may" is too broad and uncertain by citing to *Johnson*, *supra*, 576 U.S. ___ [135 S.Ct. 2551], and arguing "may," even if defined as "can," "contains a risk assessment on its face" and this "risk assessment is vague and undefined, leading to a statute that does not guide the public." We disagree.

---

[7] Carrying a concealed dirk is a general intent crime. (*Rubalcava*, *supra*, 23 Cal.4th at p. 330.) Contending that the general intent requirement of section 21310 is vague, defendant argues that it is unclear what intent is required because the statute does not explain whether it is the "carrying or the concealment" that must be intentional. We reject this contention because the statutory language is clear. Section 21310 applies to "any person . . . who *carries concealed upon the person* any dirk or dagger." (Italics added.) (See fn. 4, *ante*.) Thus, one must intend to both carry the dirk on one's person and conceal it. Indeed, it is hard to imagine a real life scenario where a person has concealed a dirk on his person but has not also carried it. This general intent is reflective of the statutory purpose of "combat[ing] the dangers arising from the *concealment* of weapons." (See *Mitchell, supra*, 209 Cal.App.4th at p. 1371.)

13

In *Johnson*, the United States Supreme Court held that part of the federal Armed Career Criminal Act (ACCA) was unconstitutionally vague. (*Johnson*, *supra*, 576 U.S. at p. ___ [135 S.Ct. at p. 2557].) That act enhances sentences of persons convicted of certain firearm offenses if they have previously been convicted of a violent felony. (*Id*. at p. ___ [135 S.Ct. at p. 2555].) One statutory definition of a violent felony under the act is a felony that is "burglary, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury to another*." (*Id*. at p. ___ [135 S.Ct. at p. 2556.) The italicized language, known as the residual clause, was the focus of the Court's vagueness analysis. (*Ibid*.) But it was not the residual clause itself that created the vagueness problem — it was the language combined with the court's analytical method for determining whether an offense is a violent felony. (*Id*. at p. ___ [135 S.Ct. at p. 2557.)

The Supreme Court employs a "categorical approach" to decide whether a conviction qualifies as a violent felony under the ACCA. (*Johnson*, *supra*, 576 U.S. at p. ___ [135 S.Ct. at p. 2557].) Under that approach, a court does not look at how the defendant committed the crime. (*Ibid*.) Rather, in "[d]eciding whether the residual clause covers a crime" the court pictures the kind of conduct involved in "the ordinary case" of the crime, and judges whether it presents a "serious potential risk of physical injury." (*Ibid*.)

The Court reasoned that two features of the residual clause combine to make it unconstitutionally vague. (*Johnson*, *supra*, 576 U.S. at p. ___ [135 S.Ct. at p. 2557].) First, "the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime. It ties the judicial assessment of risk to a *judicially imagined* 'ordinary case' of a crime, *not to real-world facts or statutory elements*." (*Ibid*., italics added.) Second, "the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." (*Id*. at p. ___ [135 S.Ct. at p. 2558].) "By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk

14

it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates." (*Ibid.*)

*Johnson* has no application here. As the *Johnson* court explained, "It is one thing to apply an imprecise 'serious potential risk' standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction." (*Johnson*, *supra*, 576 U.S. at p. ___ [135 S.Ct. at p. 2558].) Indeed, the majority in *Johnson* rejected the concern raised by the dissent that the majority's holding would create constitutional doubt for various federal statutes using terms like "substantial" and "unreasonable" risk. (*Id.* at p. ___ [135 S.Ct. at p. 2561].) It reasoned that "almost all of the cited laws require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion*. As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.' " (*Ibid.*)

Subsequent to *Johnson*, the high court emphasized *Johnson's* limited application: "The Court's analysis in *Johnson* thus cast no doubt on the many laws that 'require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion*.' [Citation] The residual clause failed not because it adopted a 'serious potential risk' standard but because applying that standard under the categorical approach required courts to assess the hypothetical risk posed by an abstract generic version of the offense." (*Welch v. United States* (2016) ___ U.S. ___ [136 S.Ct. 1257, 1262].) Several California cases have recognized this distinction. (See *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1143 [rejecting vagueness challenge based on *Johnson* to California's second degree felony-murder rule requiring commission of an inherently dangerous felony]; *Ledesma*, *supra*, 14 Cal.App.5th 830, 839-840 [rejecting *Johnson* vagueness challenge based on the asportation element in aggravated kidnapping and the one strike law]; *White, supra*, 3 Cal.App.5th at pp. 453-454 [rejecting *Johnson*

15

vagueness challenge based on the term "sexually violent criminal behavior" in the Sexually Violent Predator Act].)

Unlike the residual clause in *Johnson*, California's prohibition against carrying concealed instruments "capable of ready use as a stabbing weapon . . . that may inflict great bodily injury or death" requires application of a legal standard to real-world facts. (See *Ledesma*, *supra*, 14 Cal.App.5th at p. 838 [recognizing that this distinction is "crucial"].) No hypothetical case of an underlying crime determines the statute's applicability here. (*Ibid.*) And the elements at issue here are the type of qualitative standard deemed permissible in *Johnson*. (See *Ledesma*, at p. 839; *White*, *supra*, 3 Cal.App.5th at p. 455.)

Accordingly, we conclude the language of section 16470 is sufficiently definite to give people with ordinary intelligence notice of what is prohibited. And the knowledge requirement further protects against a person's miscalculation.

### 3. Standard for Police Enforcement and Ascertainment of Guilt

As noted, the second test for vagueness requires that the statute be definite enough to provide a standard for police enforcement and for ascertainment of guilt. (*Morgan, supra*, 42 Cal.4th at p. 605.) To that, defendant argues section 16470, because of its broad nature, "grants the police and prosecutors unfettered discretion" over who to charge with carrying a concealed dirk. He reasons the statute "punishes activity that ordinary people engage in without thinking about it." He postulates that a car key could be a dirk, ergo everyone in a parking lot could be arrested for carrying a concealed dirk. We disagree.

That the statute is broad does not mean no standard exists for police enforcement and ascertainment of guilt. Indeed, the statute is intentionally broad in order to achieve its purpose of addressing the dangers of concealed weapons. (See *Mitchell, supra*, 209 Cal.App.4th at p. 1371.) And in *Rubalcava, supra*, 23 Cal.4th 322, our high court

16

rejected the contention that the potentially broad reach of the concealed dirk statute made the statute unconstitutionally vague. (*Id*. at p. 331.)

Defendant, nevertheless, argues that without a specific intent requirement, the statute does not limit police and prosecutorial discretion. In support, he cites *Caswell*, *supra*, 46 Cal.3d 381. There, our high court held section 647, subdivision (d) — proscribing loitering in or about a public toilet for purposes of engaging in or soliciting a lewd act — did not provide law enforcement unfettered discretion, in part because the defendant must loiter with specific intent to engage in or solicit a lewd act. (*Id*. at p. 394.) The court reasoned that one is subject to arrest only if one's conduct gives rise to probable cause to believe he is loitering with the proscribed intent. (*Ibid*.) Defendant notes that here, by contrast, no specific intent requirement limits police discretion. And though he recognizes that our state's high court in *Rubalcava* rejected a vagueness challenge grounded on the statute's lack of a specific intent requirement, he argues we should ignore this part of *Rubalcava* — and find the statute vague for lack of a specific intent requirement — because in *Rubalcava*, the defendant failed to identify vague terms in the statute, and he has. (See *Rubalcava*, *supra*, 23 Cal.4th at pp. 331-332, 325, 328.) We disagree.

First, a specific intent requirement is not needed to prevent arbitrary enforcement. (*Rubalcava*, *supra*, 23 Cal.4th at pp. 332-333.) The *Rubalcava* court held that carrying a concealed dirk is not a specific intent crime. (*Id*. at p. 331.) But it emphasized that the statute has a mens rea requirement: a defendant must know he is carrying the concealed instrument and that the instrument could be used as a stabbing weapon. (*Id*. at pp. 331-332.) That requirement allays the concerns raised by defendant. (*Id*. at p. 332.) To be subject to arrest, a person's conduct must give rise to probable cause that he knew the concealed instrument may be used as a stabbing weapon. (See *Caswell*, *supra*, 46 Cal.3d at p. 394.) Such knowledge can be determined through the surrounding circumstances, including the time and place of possession, the defendant's destination, the object's

17

alteration, and any other facts. (See *Mitchell*, *supra*, 209 Cal.App.4th at p. 1372; CALCRIM No. 2501.) Thus, these factors further guide police, prosecutors, judges and juries when enforcing the law or determining guilt for a concealed dirk violation. Indeed, here, the prosecution's expert testified that in determining what an instrument is used for, he considered circumstances such as an object's "manipulation," where the object is found, and "the context of how it is carried."

Second, challenging "may" as vague is no grounds for disregarding *Rubalcava*. We have already concluded that the word "may," upon which defendant primarily focuses, when read with the rest of the language of the statute is definite enough to place a defendant on notice of the type of instrument that is prohibited. We similarly conclude, consistent with *Rubalcava*, that the statutory definition and previous judicial interpretations provide adequate standards to avoid arbitrary enforcement. (See *Williams v. Garcetti* (1993) 5 Cal.4th 561, 577 ["Although the amendment calls for sensitive judgment in both enforcement and adjudication, we would not be justified in assuming that police, prosecutors, and juries are unable to exercise such judgment"].)

As such, section 16470, defining a dirk or dagger, is not unconstitutionally vague.

## II.  Officer Testimony Regarding a Dirk's Definition

Defendant next contends the trial court erred in allowing two officers to testify to the "legal meaning of the dirk statute" because it allowed the officers to usurp the court's role in instructing the jury on the applicable law. We disagree.

### A.  Additional Background

Defendant filed a written in limine motion to preclude the deputy who found the dirk from testifying that the object in defendant's pocket was a dirk or dagger "as a matter of law." Defendant conceded the deputy could testify to the object's

characteristics but argued that saying, "it is a dirk as matter of law" would invade the jury's role.**8**  Defendant did not object to testimony about the legal definition of a dirk.

During the hearing on the in limine motion, the trial court characterized the motion as "a request that the arresting officer . . . not to refer to the object he found . . . as a dirk or a dagger."  The court ruled that if the officer "is simply testifying as an eyewitness, then I would agree that he can't offer that opinion, because it is an expert opinion.  On the other hand, if the prosecution manages to qualify [the officer] as an expert, then just like any other expert, he could give an opinion about the categorization of the object . . . ."**9**  Counsel registered no further objection to the ruling and mentioned nothing at the hearing concerning testimony about the legal definition of a dirk.

Early in his testimony, the deputy who found the dirk on defendant was asked by the prosecutor, "what is a dirk?"  The deputy answered:  "there's many different forms of it.  Usually, it's a metal object with a shaven tip."  Asked about different kinds of dirks, the deputy explained, "There's different . . . ways to do it.  [D]ifferent handles, different sizes, how people basically want to grip that object to use it as a weapon."  He further explained that the "metal part" can be three and one-half to six inches long.

On cross-examination, defense counsel asked about the composition of the object found in defendant's pocket and established it was non-magnetic.  He then asked, "have . . . you tried to locate a similar object [to the metal object] . . . .?"  When the deputy said

_____

**8**  In his written motion, defendant asked that the deputy who found the dirk, "not make any conclusory statements that the item removed from defendant's pocket was a dirk or dagger as a matter of law."  The motion read:  "[the deputy] can testify to any characteristics about the item found in the defendant's pocket, however, he should not be entitled to say — 'it is' a dirk or dagger as a matter of law.  To allow the jury to perform its ultimate fact finding role, this Court should not allow [the deputy who found the dirk] to give any conclusory statement that the item in defendant's pocket was a dirk or dagger, as a matter of law.  Since this would be left for the jury to decide."

**9**  The trial court granted the request to make all in limine rulings binding at trial.

no, counsel asked, "Have you asked anyone in the Department to follow-up and find out what that was?" When the deputy again said no, counsel asked, "Do you know what it is?" The deputy replied: "I know that it meets the description of a stabbing device known as a dirk that can be used as a weapon." Defense counsel did not object but responded: "Well, but that is your opinion."

On redirect, the prosecutor asked, "are you familiar [with] . . . what makes something a dirk, under the Penal Code?" The deputy said yes, and the prosecutor asked, "And based on your knowledge of what a dirk is, does it have to be made of a specific material?" The deputy said no, later explaining it could be made from wood or a toothbrush. Asked about identifying factors he uses to determine whether an object is a dirk, the deputy answered: "Basically, an object that you can hold in your hand that can be used as a stabbing device. [¶] Basically, an object that has an end that's been sanded down, grounded down, melted down, formed to a point, that's going to cause great bodily harm or death." The deputy also testified that the object found on defendant could "most definitely" be used as a stabbing instrument and could inflict "injury or death."

Next, the prosecution called a Woodland Police Department sergeant who had previously served on a county gang task force. In the course of seeking to qualify him as an expert in dirk recognition, the prosecutor asked, "what is a dirk?" The sergeant answered a dirk is a "manufactured cutting or stabbing weapon . . . made with what's available. [¶] Sometimes like a sharpened piece of metal." He testified that they are usually small in length, between two to six inches. He explained people who carry them "don't want them to be too big, because they're designed to be, one, a weapon of convenience; two, a weapon of quick access; and three, and most importantly, something that's concealable." He added that dirks usually have "something porous on them to grip" such as string or tape. He noted that as a gang investigator, he frequently came across dirks.

20

When the prosecution offered the sergeant as an expert, defense counsel asked to question him further. Counsel asked whether "there's a standard definition for dirk or dagger in California . . . .?" Prior to this question, there had been no questions of any witness about the "standard definition" of dirks. The sergeant said there is. Counsel then asked about the difference between a dirk and a dagger. The sergeant testified that a dagger has a double-edged blade, while a dirk "if I'm correct, is an instrument with or without a hand guard that's capable, one, [of] being concealed; and, two, being a fixed blade; and, three, capable of stabbing or cutting somebody."

Counsel responded: "I believe the officer's wrong. I believe that dirk or dagger are both synonymous . . . . They're defined under California law as a knife or other instrument with or without a hand guard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death. That's the standard definition. And I don't think we need an expert to determine what meets the definition."

The court replied: "I'm baffled; is that a question?" Counsel continued questioning, eliciting the sergeant's response: "I know there's your legal definition, but there's also the historical purposes for dirk and daggers and they are distinctly different." The sergeant added, "you're the lawyer, I'm the officer with the history degree" and ultimately conceded, "I'll take your advice and I will say that [dirks and daggers] are synonymous, counsel."

Thereafter, the trial court permitted the sergeant to testify as an expert, explaining: "I would permit [the sergeant] to give opinion testimony on the subject of identification of an object as a dirk or dagger."

The prosecutor then handed the sergeant the metal object at issue here and asked if it had "the characteristics that you would see in the dirks that you've seen over the 16 years of your career in law enforcement?" The officer said it was similar in design, noting it was taped to prevent slippage, concealable, and designed to look ordinary and be quickly accessed. The prosecutor then asked the sergeant if he had encountered an

21

individual in the field and removed that object from the person's right front pants pocket, would he consider the item to be a dirk; the sergeant said he would. The prosecutor asked no questions of the sergeant about the legal definition of a dirk on direct examination.

On cross-examination, defense counsel asked whether the point on the object at issue here is as sharp as an ice pick and the sergeant replied, "No . . . it's close, but no." Counsel asked, "what an item is used for also depends upon the circumstances where you find it, correct?" The sergeant agreed, explaining, "a lot of arrests are on the context of where do you find it; what the explanation is; what an officer may know about somebody carrying something like this." The sergeant disagreed with counsel's assertion that a Phillips tip screwdriver could be a dirk even if the tip were not sharpened saying, "if the screwdriver . . . has not been modified in any way, . . . it would seem safer to assume that it's for tightening screws."

On redirect, the sergeant explained that the "manipulation of a common item" can bring it closer to being a dirk, and also "the context of how it's carried, where it's carried, who the individual is, what an investigating officer may know about somebody."

The jury was later instructed with CALCRIM No. 2501: "The defendant is charged . . . with unlawfully carrying a concealed dirk or dagger . . . . To prove that the defendant is guilty of this crime, the People must prove that: One, the defendant carried on his person a dirk or dagger; two, the defendant knew that he was carrying it; three, it was substantially concealed on the defendant's person; and four, the defendant knew that it could readily be used as a stabbing weapon."

The instruction continued: "A dirk or dagger is a knife or other instrument, with or without a hand guard, it is capable of ready use as a stabbing weapon, it may inflict great bodily injury or death. [¶] When deciding whether the defendant knew the object could be use[d] [as] a stabbing weapon, consider all the surrounding circumstances and include the time and place of possession. [¶] Consider, also, the destination of the

22

defendant, the alteration of the object from its standard form, and other facts, if there are any."

## B. Analysis

On appeal, defendant contends the trial court's in limine ruling was error because by allowing the officer to opine on the object's characterization, the officer would necessarily have to describe what a dirk is under California law. He maintains that allowing a witness to testify to a legal definition invades the court's role to instruct the jury. He adds that the error was exacerbated because both officers misstated the law, and the jury instructions did not cure the error.

At the outset, we note that this contention is forfeited for failure to make a specific objection in the trial court. Defense counsel raised no objection to any of the testimony now challenged on appeal. Our high court has consistently held that a " ' "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable. ' " (*People v. Partida* (2005) 37 Cal.4th 428, 434 (*Partida*); See also Evid. Code, § 353, subd. (a) [case shall not be reversed by reason of erroneous admission of evidence unless the objection or motion to exclude "ma[d]e clear the specific ground of the objection or motion"]; *People v. Ward* (2005) 36 Cal.4th 186, 211 [failing to object to expert testimony deprives opposing counsel of a chance to respond, and the trial court a chance to consider the issue, and therefore forfeits the claim on appeal].) We review for abuse of discretion, and "a party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Partida*, at p. 435.)

Defendant, however, maintains the challenge is preserved because the trial court made its in limine ruling binding at trial and overruled his objection to the arresting officer testifying as an expert on the classification of the item as a dirk — and therefore further objection would have been futile. Defendant is mistaken. First, it was defense counsel who solicited testimony concerning the legal definition of a dirk, not the prosecution, and counsel did not object to the answers he received to those questions.

23

Second, because the defense only moved in limine to preclude the deputy who found the dirk on defendant's person from testifying that the object is a dirk "as a matter of law," the court's ruling was narrowly focused on whether the deputy could testify to the object's characterization. The ruling did not extend to testimony regarding a dirk's legal definition, because defendant did not object to such testimony. And trial counsel had no reason to believe a specific objection to such testimony would be futile. It was incumbent upon counsel to register an objection on the specific grounds he now advances on appeal. The failure to object to the testimony of both officers concerning the legal definition therefore forfeits the challenge on appeal. (*Partida, supra*, 37 Cal.4th at p. 435 [the objection must fairly inform the trial court, and the party offering the evidence, of the specific reasons for exclusion, so the offering party can respond appropriately and the court can make an informed ruling; should the objection be overruled, the objecting party may challenge the ruling on appeal, but it may not argue exclusion was appropriate for a reason not stated at trial].)

Moreover, the deputy who found the dirk was not tendered as an expert witness or otherwise deemed qualified by the trial court. Consequently, because the trial court ruled that a non-expert could not testify to the object's characterization, counsel had grounds to object to the deputy's testimony that the object met the definition of a dirk until he was qualified as an expert. Defendant's failure to object on the ground that the deputy was not qualified as an expert gives rise to an additional reason the contention is forfeited as to the deputy's testimony.

In any event, the failure to object was harmless. The testimony to a dirk's legal definition, while not precisely correct, generally coincided with the factors the jury was instructed to consider. The sergeant told the jury that in determining whether an object is used for a weapon may turn on whether it is modified, where it is found, what explanation is given for it, and what the officer knows about the person carrying it. While those factors do not pertain to whether an object is a dirk, they are relevant to

24

whether a defendant knew the object could be used as a stabbing weapon. Indeed, as we have noted, the jury was instructed that in deciding whether defendant "knew the object could be use[d] [as] a stabbing weapon" to "consider all the surrounding circumstances and include the time and place of possession. [¶] Consider, also, the destination of the defendant, the alteration of the object from its standard form, and other facts, if there are any."

Further, we perceive no inherent error in an expert providing a legal definition, where that definition is necessary to the expert's properly propounded opinion. Indeed, under Evidence Code section 801, expert opinion testimony may be "[b]ased on matter . . . of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates . . . ." (*Id.*, subd. (b).) The statutory definition is unquestionably the starting point for an opinion about whether an item's characteristics falls within the statutory definition.

### III. Expert Testimony that the Crime was Committed to Benefit a Gang

As to the assault with a deadly weapon case, defendant first contends reversal is required because a gang expert improperly opined that a crime had been committed, and defendant committed that crime to benefit a gang. We disagree.

### A. Additional Background

The prosecution called a detective as an expert on gangs and gang culture. The detective had responded to the car crash and took the victim's statement. At trial, the detective was also designated by the prosecution as the investigating officer.

The defense had moved in limine to preclude the detective from testifying that defendant is a gang member as a matter of law. The trial court ruled the detective could not testify that defendant is a gang member "as a matter of law," but could give an opinion as to whether defendant is an active member of a criminal street gang.

The detective thereafter testified about the Eastside Trece gang, its background, symbols, and predicate offenses. She explained that respect (particularly fear and

25

intimidation) is a primary aspect of criminal street gangs. Disrespect is frequently met with violence.

At one point, the prosecutor asked the detective: "Based on your training and experience, based on your investigation of this case as well as prior cases, based on your information that you received from other detectives . . . ., based on your review of other cases from this county, the pattern of predicate offenses that we've spoken about, do you have an expert opinion as to whether the felony conduct in this case was a gang-related activity?"

The detective answered: "My opinion is that it was done in retaliation of the disrespect that the individual, [defendant] received during a contact [with the victim] months prior to this actual crime that occurred." The detective also referenced the victim's fight with another EST member.

The prosecutor then asked: "Do you have an expert opinion as to whether *these felonies* were *committed with the specific intent* to the benefit of the EST criminal street gang?" (Italics added.) The detective answered, "Sure. Since this crime was done in broad daylight, and [defendant] yelling EST as well as pointing to it, that was obviously visible at that time." The detective added, "when individuals, communities, see crimes that occur that these EST gang members are committing, they're not likely to contact law enforcement in fear of retaliation."

The prosecutor later asked about the need to retaliate for disrespect shown to the gang: "And in this particular case, is it your expert opinion that was one of the reasons behind this offense?" The detective answered, "I believe so."

Defense counsel did not object.

## B. Analysis

On appeal, defendant challenges the detective's opinion testimony that defendant committed the crime with intent to benefit a street gang. He argues it is improper for an expert to testify to how she would decide the issue of defendant's guilt. He also

26

challenges the prosecutor's failure to present the question as a hypothetical as well as the prosecutor's reference to defendant's "specific intent."

Again, the failure to object below forfeits the challenge on appeal. (See Evid. Code, § 353; *People v. Stevens* (2015) 62 Cal.4th 325, 333 ["the failure to object to the admission of expert testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted"].) Defendant, nevertheless, argues his in limine motion sufficed to preserve the issue because an objection would have been futile in light of the court's ruling. But that motion — to preclude the detective from testifying that defendant was a gang member "as a matter of law" — was far afield of the issue raised on appeal. The challenge is thus forfeited. (*Partida*, *supra*, 37 Cal.4th at pp. 434-435.)

Anticipating that conclusion, defendant argues his trial counsel rendered ineffective assistance in failing to object. To prevail on this claim, defendant must show (1) his trial counsel's performance "fell below an objective standard of reasonableness . . . under prevailing professional norms," and (2) he was prejudiced by the deficient performance. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 692.) "[I]f the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . .'"[10] (*People v. Cudjo* (1993) 6 Cal.4th 585, 623.)

---

[10] The reason why *Strickland's* bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.] . . . It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' [Citations.] The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86 [131 S.Ct. 788].)

27

Here, a satisfactory explanation exists for not objecting to the prosecutor's failure to present the question as a hypothetical. The detective had been designated as the investigating officer and thus was present throughout trial. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 951.) Having heard the evidence (along with the jury) from which she would base her opinion, there was little practical need to restate the evidence as a hypothetical. Indeed, had defense counsel objected, it might well have resulted in the rehashing of damaging evidence — albeit presented as a hypothetical. Thus, counsel could have made the tactical decision not to object.

So too, counsel may have opted not to object to the phrasing, "whether *these felonies* were committed" because an alternative phrasing, such as "the two alleged assaults with a deadly weapon" or "the alleged collision" would not have been materially different. Indeed, because the focus of the prosecutor's question was the nexus between defendant's actions and the gang benefit, the jury was unlikely to interpret it as asking for an opinion on defendant's guilt. Accordingly, we cannot conclude that no satisfactory explanation exists for the failure to object. (See *People v. Torres* (1995) 33 Cal.App.4th 37, 48 ["Generally, the failure to make objections is a matter of trial tactics which appellate courts will not second-guess"].)

And in any event, defendant has failed to show that prejudice resulted. To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694 [104 S.Ct. at p. 2068]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) "The likelihood of a different result must be substantial, not just conceivable." (*Richter*, *supra*, 562 U.S. at p. 112 [131 S.Ct. at p. 792].) Defendant argues a more favorable outcome was probable because the detective's testimony cast an aura of credibility on the victim's story. He maintains the victim's testimony was problematic and unsupported, the police never found the black Honda, no surveillance footage was found, and police failed to canvas the area for witnesses. Further, the victim

28

admitted some of his testimony had been "guarded." Defendant adds that in closing argument, the prosecutor relied on the detective's testimony: " 'You also heard [the detective] tell you on the stand, 'This was most definitely for the benefit of a gang.' ' " We disagree with defendant.

Again, it was not probable that the jury would read more into the expert testimony than an opinion that the criminal conduct benefited a gang. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1048 [an expert may properly opine on the factfinder's ultimate issue, including whether certain criminal conduct benefited a gang].) Moreover, the evidence of the underlying offense, through the victim's testimony, needed no bolstering. Though the victim conceded he had been a "bit guarded" in his testimony regarding his own gang associations, he was consistent regarding the underlying offense. Immediately after the collision, he identified defendant as the driver both to 911 and to responding officers. He also reported a prior altercation with defendant to investigating officers and said the collision might have been in retaliation. And his trial testimony was consistent with that contemporaneous reporting. In short, overwhelming evidence beyond the expert opinion supported the conviction.[11]

## IV. Expert Testimony Regarding the Predicate Offenses

Defendant contends the detective's expert opinion testimony in the assault with a deadly weapon case failed to prove the predicate offenses were committed by Eastside

---

[11] We note that the prosecutor's mention of defendant's "specific intent," when asking "whether these felonies were committed with the specific intent to the benefit of the EST criminal street gang?" was objectionable. (See *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199 [minor's intent was an issue reserved to the trier of fact]; *People v. Killebrew* (2002) 103 Cal.App.4th 644 [expert testimony as to the defendant knowledge and intent were issues properly reserved to the trier of fact], disapproved of on other grounds in *People v. Vang*, *supra*, 52 Cal.4th 1038, 1047, fn. 3).) Nevertheless, it was harmless because the testimony that defendant shouted EST and pointed to his tattoo amply supported a finding of specific intent to benefit a gang.

Trece members because testimony concerning those offenses relayed case-specific facts in violation of *Sanchez, supra*, 63 Cal.4th 665. We disagree.

## A. Additional Background

The gang expert testified that she is familiar with Eastside Trece, noting that it is one of the predominant Sureño gangs in Yolo County. The gang's primary activities include the commission of criminal offenses, including assaults, burglaries, robberies, and grand theft. The expert opined that the charged offense was committed to benefit Eastside Trece. She also testified about five predicate offenses establishing Eastside Trece as a criminal street gang. She had become familiar with these offenses by reviewing prior reports and speaking with detectives on the gang task force. She noted that in each case, the offender was an Eastside Trece member. None of the predicate offenses involved defendant.

The prosecution also submitted certified copies of documents reflecting the convictions the expert testified about. The documents reflect the convictions and section 186.22, subdivision (b) findings but make no mention of Eastside Trece.[12]

## B. Analysis

To establish that an organization is a criminal street gang, the prosecution must prove, among other things, that the group has engaged in a pattern of criminal conduct, which requires a showing that the group has engaged in the requisite number of enumerated predicate offenses. (§ 186.22, subd. (e).)

---

[12] The prosecutor's charging documents were properly included in these documents, but while those documents included section 186.22, subdivision (b) allegations or a section 186.22, subdivision (a) charge, none identified a specific gang; nor did the executed plea forms also included as part of the record of conviction identify a specific gang. The contention defendant raises here could have been avoided had those documents referenced Eastside Trece.

Defendant argues that nothing in the documents establish the crimes were committed by Eastside Trece members as none of the documents actually identify the gang. He maintains that, under *Sanchez, supra*, 63 Cal.4th 665, the detective's opinion is insufficient to establish the requisite predicate offenses for purposes of the gang enhancement. We disagree because the predicate offense testimony involved background facts, not case-specific facts barred by *Sanchez*.

*Sanchez* held that "[i]f an expert testifies to case-specific out-of-court statements to explain the bases for his [or her] opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception." (*Sanchez, supra*, 63 Cal.4th at p. 684.) "Case-specific" facts are facts "relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.)

Here, however, the expert's testimony regarding Eastside Trece predicate offenses involved neither the particular events nor participants involved in the case being tried. Rather, it pertained to historical facts of the gang's conduct and activities. A predicate offense is essentially a chapter in the gang's biography. Thus, predicate offenses are background facts relevant to an expert's opinion about whether a group has engaged in a pattern of criminal gang activity and is a criminal street gang under section 186.22.

Indeed, *Sanchez* did "not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his expertise." (*Sanchez, supra*, 63 Cal.4th at p. 685.) As the court observed, "an expert's background knowledge and experience is what distinguishes him from a lay witness, and . . . testimony relating such background information has never been subject to exclusion as hearsay, even though offered for its truth." (*Ibid*.) Thus a gang expert may relate such background information regarding his or her knowledge and expertise, as well as premises generally accepted within her field, even though such testimony is offered for its truth. (*Ibid*.) And, more to

31

the point, a gang expert may testify concerning general background information relating to gang culture and the "*history* and general operations" of a specific gang. (*Id*. at p. 698, italics added.) Applying this rule in *Sanchez,* our high court noted that the gang expert's testimony about "general gang behavior or descriptions of the . . . gang's *conduct* and its territory" was "background testimony" based on well-recognized sources in the expert's area of expertise. (*Id*. at p. 698, italics added.)

As recognized in *People v. Meraz* (2018) 30 Cal.App.5th 768 (*Meraz II*), review granted March 27, 2019, S253629, *Sanchez's* reference to general background testimony "plainly includes the general background testimony [the gang expert gives] about [the gang's] operations, *primary activities*, and *pattern of criminal activities*, which was unrelated to defendants or the current" crimes. (*Meraz II*, at p. 781, italics added; accord, *People v. Blessett* (2018) 22 Cal.App.5th 903, 943-945, review granted Aug. 8, 2018, S249250; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 411 (*Vega-Robles*).) Thus, a gang expert may "testify to non-case-specific general background information about [the gang], its rivalry with [another gang], its primary activities, and *its pattern of criminal activity*, even if it was based on hearsay sources." (*Meraz II,* at pp. 781-782, italics added.)

In defendant's case, the predicate offenses — none of which involved defendant — are five chapters in Eastside Trece's biography. The facts underlying these predicate offenses are appropriately characterized as background information relevant and admissible to Eastside Trece's history and "conduct." (*Sanchez*, *supra*, 63 Cal.4th at p. 698.)[13] We therefore conclude the expert's testimony concerning the predicate offenses was not violative of *Sanchez*.

---

[13] We are aware that a split of authority exists as to whether testimony about predicate offenses is case-specific information. In *People v. Lara* (2017) 9 Cal.App.5th 296, 337, the court did not consider the difference between background facts and case-specific facts. In *People v. Ochoa* (2017) 7 Cal.App.5th 575, 588-589, the court treated all

**V.  SB 1393**

In a supplemental brief, defendant contends remand is appropriate to allow the trial court to consider exercising its authority under SB 1393.  The People agree, and so do we.

SB 1393 authorizes a trial court to strike a section 667, subdivision (a) prior serious felony enhancement in the interest of justice under section 1385, effective January 1, 2019.  (Stats. 2018, ch. 1013.)  SB 1393 applies retroactively to cases not yet

---

predicate offense information as case-specific facts.  There, the expert testified that people involved in the predicate offenses had admitted their gang membership.  The *Ochoa* court concluded that these admissions were case-specific facts.  The totality of the court's analysis on this is as follows:  "It seems clear the hearsay statements at issue in the present case—out-of-court statements by individuals admitting being members of the [gang]—are case-specific hearsay rather than general background information about the [gang].  *Sanchez* gave the following as one in a series of examples of the distinction:  'That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph.  That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify.  The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang.'  [Citation.]  By analogy, that someone admitted being a gang member is also a case-specific fact."  (*Ochoa*, at pp. 588-589.)

But in the *Sanchez* court's example, it is not clear whether the court was referencing a hypothetical "associate" who was a participant in the events "involved in the case being tried" (*Sanchez, supra*, 63 Cal.4th at p. 676) or a fellow gang member not involved in the case, but who had otherwise committed an unrelated predicate offense.  We think the *Sanchez* court meant the former, as an example of a case-specific fact, because:  (1) the issue before the *Sanchez* court did not relate to facts underlying predicate offenses, but rather related to facts establishing the defendant's gang membership, which included gang expert testimony concerning the gang affiliations of people defendant had been with on previous occasions, and (2) the *Sanchez* court's explanation of background facts includes facts related to the conduct, history and operations of the gang.  Consequently, we disagree with the *Ochoa* court's conclusion that the *Sanchez* example applies to predicate offenses.  Accordingly, to the extent that *Ochoa* can be read as holding that all predicate offense testimony is case-specific hearsay, we respectfully disagree.

final. (*People v. Jones* (2019) 32 Cal.App.5th 267, 273; *People v. Garcia* (2018) 28 Cal.App.5th 961, 973.)

We agree with the parties that remand is appropriate so the trial court may consider exercising its authority regarding defendant's section 667, subdivision (a) enhancement.

## VI. Fines and Fees

In a supplemental brief, defendant contends the imposition of fines and fees violated his right to due process and freedom from excessive fines.

### A. Additional Background

In the dirk case, the trial court imposed a $300 restitution fine (§ 1202.4, subd. (b)(1)), a stayed $300 parole revocation fine (§ 1202.45), an $80 court operations assessment (§ 1465.8), and a $60 criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)). In the assault with a deadly weapon case, the court imposed a $300 restitution fine, a stayed $300 parole revocation fine, a $30 collection fee (§ 1202.4, subd. (l)), a $40 court operations assessment and a $30 conviction assessment.

Defendant raised no objection to the fines and fees imposed.[14]

### B. Analysis

Defendant cites *Dueñas, supra*, 30 Cal.App.5th at page 1164, which held that due process requires the trial court to stay execution of restitution fines, as well as court operation and conviction assessments, until the court has held a hearing and determines the defendant has the present ability to pay. He argues that one who is in prison lacks meaningful earning capacity, and he asserts no evidence suggests he has the ability to

---

[14] Defendant subsequently moved ex parte to covert his fines to a concurrent sentence, asserting his status as an indigent prisoner unable to pay outstand fines. The trial court denied the request.

34

pay. He also argues his counsel's failure to object should not preclude a review on the merits as the *Dueñas* decision was unforeseen.

The People respond that defendant has forfeited the contention by failing to raise it below. The People, nevertheless, allow that because the matter must be remanded in light of SB 1393, defendant will, on remand, have an opportunity to request a hearing on his ability to pay.

We decline to find forfeiture because the trial court imposed only the minimum restitution fines, along with mandatory operation and conviction assessments, and therefore at the time of sentencing, defendant had no cause to object. (See *People v. Jones* (2019) 36 Cal.App.5th 1028, 1034 (*Jones*) ["[the defendant] could not have been expected to anticipate *Dueñas*, even though *Dueñas* applied principles first articulated in other contexts long ago"]; cf. *People v. Frandsen*, *supra*, 33 Cal.App.5th at p. 1154 [Pre-*Dueñas*, the defendant had an obligation to object on ability to pay grounds where the trial court imposed the maximum restitution fine].)

However, we are cognizant of cases holding harmless the absence of an ability to pay hearing where the prison *sentence* imposed afforded the defendant ample opportunity to pay the fines and fees. (See *Jones, supra*, 36 Cal.App.5th at p. 1035 ["Given that the restitution fine is $300 and the assessments are $70, Jones will have sufficient time to earn these amounts during his sentence, even assuming Jones earns nothing more than the minimum"]; *People v. Johnson* (2019) 35 Cal.App.5th 134 ["The idea that he cannot afford to pay $370 while serving an eight-year prison sentence was unsustainable"].) And here, defendant, having received only the minimum fines, will presumably have ample opportunity to pay them through prison wages during his 21-year four-month sentence.

Nevertheless, defendant may, as the People suggest, raise his ability to pay before the trial court when it considers exercising its discretion under SB 1393.

## VII.  Senate Bill No. 136

Finally, on rehearing, defendant asks that we strike his one-year prior prison term enhancement in light of SB 136.  Effective January 1, 2020, SB 136 eliminates the section 667.5 one-year prior prison term enhancement for all prior convictions, except sexually violent offenses.  (§ 667.5, subd. (b).)  The People agree defendant is entitled to its ameliorative benefit.

We agree with the parties that because defendant's sentence is not yet final, and because his prior offense (possessing a prohibited weapon) was not a sexually violent offense, he is entitled to the ameliorative benefit of the amendment.  (See *People v. Vieira* (2005) 35 Cal.4th 264, 306 ["for the purpose of determining retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed"]; *In re Estrada* (1965) 63 Cal.2d 740, 748 [for a non-final conviction, "where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed"].)

We will therefore strike the one-year prior prison term.

## DISPOSITION

The judgment is modified to strike the one-year prior prison term enhancement. And the matter is remanded so the trial court may consider exercising its discretion under SB 1393, at which time defendant can object to fines and fees on grounds of ability to pay. In all other respects, we affirm.


                       /s/
                     MURRAY, J.


We concur:


   /s/
RAYE, P. J.


   /s/
BLEASE, J.